I .WHIPPLE, J.
This appeal arises out of a suit for damages under the Jones Act and general maritime law. Defendant, J. Ray McDer-mott, Inc., appeals the judgment of the trial court in favor of plaintiff, Kristian Nielsen, Jr. For the following reasons, we affirm as amended and remand.
FACTS AND PROCEDURAL HISTORY
In 1995, Nielsen was employed as a diver by McDermott Underwater Services, a division of J. Ray McDermott, Inc.[1] In his capacity as a diver, he was assigned by McDermott to work aboard the Derrick Lay Barge 269 (“DLB 269” or “the barge”), a vessel owned by CCC Fabrica-ciones Y Construcciones, S.A. de C.V. (“CCC”), a Mexican corporation engaged in the business of marine construction.

The McDermottlOPI Merger

In January of 1995, McDermott merged with OPI, International, Inc. (“OPI”). Pri- or to the merger, OPI and Grupo Consor-cio de Fabricaciones y Construcciones, S.A. de C.V. (“Grupo”), another Mexican corporation, owned all of the shares of stock in CCC. OPI and Grupo had entered into a shareholders’ agreement with CCC, whereby these entities made provisions re *150 garding CCC’s ownership, control, management and operations.
With regard to ownership, the agreement delineated that OPI owned 49% of the stock of CCC and Grupo owned the remaining 51% of the stock. With regard to management of CCC, the agreement provided that CCC was to be managed by an eight-member board of directors, with four members appointed by Grupo and four members selected by OPI. Additionally, a chief financial officer was to be appointed by Grupo, and an offshore | ^operations manager and principal accounting officer were to be nominated by OPI, subject to approval by Grupo. Finally, with regard to operations, the agreement provided that Grupo and OPI were to supply CCC with specified personnel for its operations, and CCC would reimburse OPI and Grupo the costs of employing such personnel furnished to CCC. The DLB 269 was specifically listed as a vessel covered by the terms of the shareholders’ agreement.
Thus, prior to the merger of OPI and McDermott, OPI furnished diving crews to CCC for operations aboard the barge. After the merger, McDermott became the owner of 49% of the shares of CCC. Consequently, McDermott began furnishing diving crews to CCC for work performed by the barge, as OPI had done previously pursuant to the shareholders’ agreement. McDermott supervisory personnel, in testifying at trial, referred to this arrangement between McDermott and CCC as the “joint operating agreement.” Through this arrangement, Nielsen was assigned by McDermott to work aboard the barge in the Bay of Campeche off the coast of Cuidad del Carmen, Mexico, as part of the McDermott diving crew.

Weather Conditions in the Bay of Cam-peche in September and October, 1995

In late September of 1995, Tropical Storm Opal crossed the Yucatan Peninsula and entered the Bay of Campeche. By October 2, while over the waters of the Bay of Campeche, Opal developed into a hurricane. Because of the adverse weather, CCC made the decision that the barge would pick up anchors, tow away from the production platform and ride out the .storm. Thus, the barge was towed away from the production field by the M/V CAPTAIN JOHN and M/V NORTH CAROLINA, vessels owned by Northbank Towing, Inc. (“Northbank”) and assigned to tow the barge|4through a charter agreement between Northbank and CCC. According to Robert Trosclair, Sr., captain of the M/V CAPTAIN JOHN, they were experiencing twelve to fourteen foot seas at that time.
As Hurricane Opal moved north in the Gulf of Mexico, the weather conditions in the Bay of Campeche began to improve, and the barge was towed back toward the field. However, by October 9, Tropical Storm Roxanne was traveling from the northwest Caribbean toward the southern Gulf of Mexico. By October 10, Hurricane Roxanne was moving across the Yucatan Peninsula, and diving operations were suspended. The McDermott divers in saturation began decompression. Also on that date, CCC ordered the barge back under tow away from the field. During the time that the barge was under tow for both Hurricanes Opal and Roxanne, it was not being towed toward safe harbor, but rather, was simply under tow to ride out the storms. Additionally, no diving services were being performed while the barge was under tow, and the divers were “killing time,” watching movies and playing cards.
On October 11, Charles Rountree, McDermott’s diving superintendent aboard the barge, began emergency decompression of McDermott’s divers. According to Rountree, he also requested an evacuation of the McDermott dive crew to Edmund Burgueno, McDermott’s shoreside diving coordinator, but Burgueno refused the request. The emergency decompression was successfully completed, and the divers were out of decompression by the early hours of October 12.
*151 By the morning of October 14, a cold front was pushing off the coast of Texas and Louisiana, and it was expected to interact with Roxanne. The Wilkens Weather Report, which was received daily by McDermott, predicted that when the storm met the cold front, it would strengthen to | ¡¡hurricane force, but then rapidly weaken. In fact, Roxanne intensified when it met the cold front, and it changed direction and began moving back to the southeast, toward the location of the barge.
On October 15, the barge encountered heavy winds and thirty to thirty-five foot seas, and the tow lines of both the MW CAPTAIN JOHN and the MW NORTH CAROLINA parted. After attempts to repair the tow lines and reconnect the barge failed, the barge dropped anchors in an attempt to hold the bow into the seas. Unfortunately, these efforts also failed, and the vessel’s stern turned into the seas. The barge then began to sink by the stern.
Nielsen and the other members of the McDermott diving crew, as well as all of the barge’s crew members, eventually were forced to abandon ship and jump into the thirty to thirty-five foot seas. Although several other individuals and crew members perished at sea, plaintiff managed to swim to a life raft. After fighting the seas for hours in the life raft, he was rescued by the MW NORTH CAROLINA.
Thereafter, Nielsen instituted this suit pursuant to the Jones Act, 46 App.U.S.C. § 688, and general maritime law against McDermott and Northbank. Nielsen sought damages for physical and mental pain and suffering, lost wages, impairment of future earning capacity and medical expenses.
On the morning of trial, McDermott and Nielsen stipulated that Nielsen was a Jones Act seaman and that there was no negligence on his part in contributing to this accident. Following a bench trial, the trial court concluded that McDermott was negligent in several respects.[2] With regard | (¿o Northbank, the trial court found that Northbank’s captains and crew had “performed in the best traditions of the sea, and certainly exercised more than reasonable care under the circumstances.” Thus, the trial court found no liability on the part of Northbank. Accordingly, the trial court rendered judgment in favor of Nielsen and against McDermott in the amount of $966,272.00, consisting of $350,000.00 in general damages; $96,148.00 in past lost wages; $429,681.00 in future loss of wage earning capacity; and $90,443.00 in loss of fringe benefits. Judgment was further rendered in favor of Northbank, dismissing Nielsen’s claims against it.
From the judgment in favor of Nielsen, McDermott appeals, assigning twenty-four alleged errors as follows:
(1) The trial court erred when it found that McDermott controlled the movement of the barge, a finding which McDermott alleges formed the basis of the trial court’s imposition of Jones Act negligence.
(2) The trial court erred in finding that McDermott breached its duty to Nielsen by failing to furnish a safe place to work and by failing to evacuate Nielsen and the dive crew.
(3) The trial court erred in finding McDermott negligent for failing to order the Northbank vessels to tow the barge to safe harbor.
(4) The trial court erred when it implicitly found that the McDermott Severe Weather Guideline applied to the DLB 269.
(5) The trial court erred in referring to a “joint venture” agreement in its reasons for judgment, where the only agreement of evidence is the shareholders’ agreement between OPI and CCC.
(6) The trial court erred in finding that Burgueno was a “project manager” with *152 supervisory authority over McDermott personnel aboard the barge.
|7(7) The trial court erred in stating that J.J. Riddle had testified that it was customary to evacuate personnel from barges in the Gulf of Mexico during the approach of tropical storms and hurricanes.
(8) The trial court erred in accepting the testimony of Rountree, who has a claim pending against McDermott arising out of this same incident.
(9) The trial court erred in finding that the barge was at all relevant times in radio and fax communication with McDermott’s Bayou Black office.
(10) The trial court erred in finding that Nielsen pulled a drowned Mexican national onto the deck of the MTV NORTH CAROLINA.
(11) The trial court’s discussion in its reasons for judgment of the experience of those rescued by the M/V CAPTAIN JOHN is irrelevant in that Nielsen was never aboard the M/V CAPTAIN JOHN.
(12) The trial court erred in finding that Nielsen told Don Terry that he was “having extreme emotional problems.”
(13) The trial court erred in finding that Nielsen advised Riddle that he was “emotionally disturbed.”
(14) The trial court erred in finding that Nielsen was “listed” among McDermott’s saturation divers.
(15) The trial court erred in finding that “most” McDermott saturation divers earn between $60,000.00 and $80,000.00 per year.
(16) The trial court erred in finding that there was “some evidence in the record that good divers can earn up to $120,000.00 per year.”
(17) The trial court erred in accepting the testimony and economic calculations of Dr. Randolph Rice, which were based on erroneous assumptions.
|s(18) The trial court erred in finding that Nielsen would have become a diving supervisor at the end of his diving career.
(19) The trial court erred in finding that Nielsen was an able, well-thought-of, hardworking diver who had his best years ahead of him.
(20) The trial court erred in finding that Nielsen had the potential to earn only $14.00 per hour as a nurse.
(21) The trial court erred in accepting Dr. Rice’s calculations as to Nielsen’s past wage loss, which was computed from the date of the accident on October 15, 1995, when Nielsen was actually paid wages through December 4,1995.
(22) The trial court erred in failing to deduct $16,000.00 in advances from Nielsen’s economic loss award.
(23) The trial court erred in accepting Dr. Rice’s calculation of Nielsen’s lost fringe benefits.
(24) The trial court erred in awarding Nielsen $350,000.00 in general damages.[3]
Nielsen answered the appeal, averring that the general damage award was too low and that the trial court erred in failing to award him pre-judgment interest on the awards of past damages.
JONES ACT NEGLIGENCE (McDermott’s Assignments of Error Nos. 1, 2, 3, 4, 5, 6, 7, 8, & 9)
The Jones Act provides a cause of action in negligence for a seaman injured in the course of his employment against his maritime employer. 46 App. U.S.C. § 688. Under the Jones Act, both the employer and the seaman are obligated to act with ordinary prudence under the circumstances. | Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 338 (5th Cir. 1997). Negligence on the part of the employer may arise in many ways, including *153 the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. Cabahug v. Text Shipping Company, 98-0786, p. 4 (La.App. 1st Cir.5/12/00), 760 So.2d 1243. Moreover, the employer is not relieved of the duty to provide a safe place to work merely because the employee is working aboard a vessel owned by another. Martin v. Walk, Haydel & Associates, Inc., 742 F.2d 246, 249 (5th Cir.1984); see also Walton v. Cooper/T. Smith Stevedoring, 97-0100, p. 6 (La.App. 4th Cir.3/4/98), 709 So.2d 941, 945.
The negligence of the employer must be determined according to the standard of a reasonable employer under like circumstances, and any corresponding negligence on the part of the seaman is to be determined according to a reasonable seaman under like circumstances. Vendetto v. Sonat Offshore Drilling Co., 97-3103, p. 9 (La.1/20/99), 725 So.2d 474, 479, cert. denied, 527 U.S. 1023, 119 S.Ct. 2369, 144 L.Ed.2d 773 (1999). Nevertheless, since the duty to provide a safe place to work allocates substantial risk of maritime employment to the employer, identical conduct is not demanded of the employer and the employee. The law allocates different risks to different parties, and that allocation forms part of the reasonableness equation in the negligence determination. The determination of who had the duty to eliminate or minimize the risks of an injury-causing hazard is central to the negligence inquiry. Vendetto, 97-3103 at p. 9, 725 So.2d at 479.
In the present case, the trial court concluded that McDermott was negligent in: (1) failing to furnish a safe place to work; (2) failing to |inevacuate its dive crew from the barge in the approach of Hurricane Roxanne; (3) failing to order Northbank to tow the barge to safe harbor; and (4) failing to enforce McDer-mott’s Severe Weather Guideline. We note that a finding of any one of these bases of negligence would be sufficient to establish liability on the part of McDer-mott. Because we find the record overwhelmingly supports the trial court’s finding that McDermott was negligent in failing to evacuate its dive crew, the indicated course of action in McDermott’s Severe Weather Guideline, we need not address the issues presented by the other bases of liability.[4] See Jenkins v. Sonat Offshore U.S.A., Inc., 96-2504, p. 4 (La. App. 1st Cir.12/29/97), 705 So.2d 1184, 1187.
McDermott contends that it can not be held liable for its failure to evacuate the dive crew in the face of Hurricane Roxanne, because it did not have the authority to take those measures to protect its employees. Rather, McDermott contends, CCC had the only authority to evacuate personnel from the barge. Additionally, McDermott further contends that the trial court erred in implicitly finding that McDermott’s Severe Weather Guideline, which requires evacuation of non-essential personnel in the approach of a hurricane, applied to the barge, because the barge was not owned or operated by McDermott.

McDermott’s Severe Weather Guideline

Prior to the incident in question, McDermott had in effect a manual entitled J. Ray McDermott, Inc. Marine Construction Severe Weather Guideline. The stated purpose of the Severe Weather Guideline is aslnfollows:
The purpose of this severe weather guideline is to specify required detailed actions for all personnel and equipment associated with severe weather. All precautions are to be taken in advance to prevent risk to personnel and equip *154 ment when preparing for a storm. Since a storm may curve and recurve at any point it is potentially dangerous as long as it is in the area. (Emphasis added).
The Guideline then details several phases of responses to be conducted throughout the “storm season” and as a storm approaches a work site. The Guideline provides for the formation of a storm committee, which is responsible for meeting daily to review storm data and for making certain decisions regarding safety measures to be taken as a storm approaches, including whether personnel shall be evacuated.
Pursuant to the Guideline, when the storm edge reaches a certain radius from a work site designated as the distance required to secure the ongoing operations, recover the anchors and tow to a designated location, the following tasks are among those listed to be performed: If so determined by the .storm committee, all nonessential personnel may be evacuated by groups on helicopters and/or crew boats available; and divers will be brought to the surface in sufficient time to be evacuated prior to the vessel departing for the designated location. Moreover, when it is determined that a vessel will take evasive action rather than towing to safe harbor, the Guideline specifically provides as follows:
The storm committee shall address the question of evacuation of personnel from the unit. If the vessel plans to take evasive action because of its characteristics or the unavailability of a safe harbor, evacuation of the crew will be mandatory unless local logistical support for the evacuation is either nonexistent or grossly unsafe. (Emphasis added).
Despite these clear mandates, McDer-mott argues that it was not obligated to take these protective measures for its dive crew aboard the h ¡¡barge and that the trial court erred in finding otherwise, positing that its Severe Weather Guideline only applies to vessels owned and operated by McDermott. In support of its position, McDermott relies upon the testimony of Hans Fuhri, McDermott’s marine superintendent.
Fuhri testified that as marine superintendent, he is responsible for all marine transportation for McDermott, including transportation to and from derrick barges and pipe lay barges in the Gulf of Mexico. He further testified that he was familiar with the Severe Weather Guideline, but felt that its mandates did not apply to the DLB 269, because it was not a vessel owned or operated by McDermott. However, Fuhri later acknowledged that had he known that McDermott had a dive crew aboard the barge, he would have wanted to evacuate them from the vessel in the approach of the hurricane.
Furthermore, we note that there is nothing in the language of the Severe Weather Guideline itself which would limit its application only to McDermott employees working aboard McDermott vessels. To the contrary, as stated above, the document specifically provides that the purpose of the guideline is to prevent the risk of harm to all personnel, as well as equipment, in the approach of a storm. Thus, regardless of whether the Severe Weather Guideline applied to a vessel owned by another, we find no manifest error in the trial court’s implicit conclusion that it applied to all McDermott personnel.

Customary Practice in the Industry of Evacuatiny Personnel

Moreover, even in the absence of the Severe Weather Guideline, testimony at trial established that, in the face of severe weather, it was a standard practice in the industry to abandon work sites and head for safe port or evacuate personnel if the vessel could not tow to safe port. J.J. Riddle, | ^McDermott’s safety officer, testified that when he worked as a diver in the Gulf of Mexico, there were many occasions when he was evacuated due to the approach of heavy weather. However, al *155 though he initially indicated that he had been evacuated from work sites, Riddle later clarified that when he had been working aboard dive boats, rather than barges, the boat would simply head for safe port. Indeed, when working as a diving supervisor aboard dive boats, Riddle himself made the decision to pick up anchors and head for safe port with the approach of bad weather.
He stated that when working aboard a barge, he did not make those decisions for the barge and never had to ask to evacuate the divers, because the decision to pick up anchors and tow away was made without him asking. Thus, while Riddle did not specifically testify as to any personal experiences aboard a barge where the dive crew was evacuated due to the approach of severe weather, he did testify that he had experienced situations where, while working aboard a dive boat, the boat abandoned location and headed for safe port. Nonetheless, and importantly, Riddle testified that in all the time that he had worked as a diving supervisor, he never recalled a situation where the dive crew was left on a barge in the face of a hurricane.
Moreover, Don Terry, manager for McDermott Underwater Services, testified that in his experience as a diver and owner of a diving company, divers were evacuated from work sites in the Gulf of Mexico because of the approach of a hurricane.
Thus, we find no manifest error in the trial court’s factual conclusion that it was customary to evacuate personnel from barges in the Gulf of Mexico with the approach of tropical storms or hurricanes.
| uMcDermott’s Authority and Ability to Evacuate its Dive Crew
Additionally, we find no merit to McDermott’s argument that it did not have the authority to evacuate its personnel aboard the barge. While initially denying at trial that he had such authority, John Hart, McDermott’s diving manager, later admitted, after being confronted with his prior deposition testimony, that he did in fact have the authority to evacuate McDermott’s dive crew from the barge. Also, Edmund Burgueno, McDermott’s diving coordinator situated in Ciudad del Carmen, testified that if he had received a request from McDermott’s diving superintendent on the barge to evacuate the dive crew, he would have done it. He stated that arranging transportation for the evacuation of the divers was “part of [his] job.”[5]
Both Hart and Burgueno acknowledged that Ciudad del Carmen, a port city, had work boats and crew boats traveling in and out of the port to and from the Bay of Campeche on a routine basis. Ciudad del Carmen also had a helicopter base with helicopters located there. Hart testified that if he had wanted to arrange transportation to get personnel off the barge, which was positioned off the coast of Ciudad del Carmen, there was available transportation at that port.
*156 | ^McDermott’s claim that it had no authority to evacuate its own crew is also contradicted by the terms of the agreement under which it was operating and supplying personnel to CCC. As stated above, the testimony and evidence at trial establishes that McDermott had merged with OPI and thereafter began to furnish dive crews to CCC for work performed aboard the barge, as contemplated by the shareholders’ agreement originally entered into by OPI and CCC.[6] This shareholders’ agreement specifically provided that OPI, and consequently McDermott as its predecessor, was to appoint an offshore operations manager. The offshore operations manager to be appointed by McDermott was specifically authorized to “take such action and make such immediate expenditures” as he deemed necessary to protect against loss of life and personal injury. Thus, we find no merit to McDermott’s claim that it lacked authority to evacuate its dive crew from the barge.

11(-McDermott’s Actions Herein

In the days preceding the sinking of the barge, McDermott personnel aboard the barge, on shore in Ciudad del Carmen and at its Morgan City office were all aware of Hurricane Roxanne’s progress and location in relation to the barge.[7] Yet, *157 McDermott took no action to evacuate its dive crew.
On October 11, Rountree contacted Jim Mullins and Mike Ambrose in McDer-mott’s main office in Morgan City and requested an emergency decompression schedule to get the divers out of saturation and onto the deck of the barge. According to Rountree, he also spoke with Burgueno and requested that the McDermott divers be evacuated from the barge. Rountree testified that Burgueno refused the request, stating that he did not know how CCC would feel about such an evacuation and that there were not enough hotel rooms in Ciudad del Carmen for the twenty-one members of the dive crew. Bur-gueno denied that Rountree ever made a request to him that the dive crew be evacuated.
117McDermott contends that the trial court erred in accepting as true Rountree’s testimony that he had made a request to Burgueno to evacuate the dive crew. McDermott argues that Rountree’s testimony is not credible, because he currently has a suit pending against McDermott as a result of the sinking of the DLB 269.
We find no error in the trial court’s reliance on Rountree’s testimony, a matter within the province of the trial court in its assessment of his credibility as a witness. The trial court’s reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
In the instant case, no other witness could verify or dispute the conversation between Rountree and Burgueno. Nonetheless, the fact that Rountree requested an emergency decompression schedule for the divers still in saturation together with the testimony of Roy Cline, one of McDer-mott’s dive supervisors aboard the barge, supports Rountree’s account of the events that transpired.
Specifically, Cline testified that before the divers were out of saturation, Roun-tree spoke to the remaining divers at the area of the saturation chamber. At the meeting, Rountree told the divers, “I’m staying,” and informed those assembled that a rack operator was also' staying. Rountree then indicated that he needed two volunteers to stay to help get the divers out of saturation. According to Cline, he raised his hand to volunteer to stay, and at that point, Rountree started “head counting.” Cline stated that his understanding of the exchange that occurred was that the remainder of the dive crew was going' to be taken off of the barge. Thus, we find no error | isin the trial court’s decision to accept Rountree’s version of the events that transpired.
In sum, despite the fact that all diving operations had been suspended, that McDermott had a policy in place clearly requiring evacuation of nonessential personnel in the face of a storm, and that McDermott had the authority and capability to take such action herein, McDermott took no action to evacuate its dive crew from the barge. Considering the foregoing and the record as a whole, and preter-mitting discussion of the economic motive and potential contract problems alleged by Nielsen as the reason for McDermott’s failure to act, we find no manifest error in the trial court’s conclusion that McDer-mott’s failure to evacuate its dive crew from the barge in the days preceding the sinking of the barge constituted actionable negligence on its part.
Thus, these assignments of error lack merit
DAMAGES

General Damages

(McDermott’s Assignments of Error Nos. 10, 11, 12, 13 & 24; Nielsen’s Assignment of Error No. 1)
McDermott further contends that the general damage award of $360,000.00 *158 is excessive. Nielsen, on the other hand, answered the appeal, contending that the award is abusively low.
The trier of fact is accorded much discretion in fixing general damage awards. LSA-C.C. art. 2324.1; Cheramie v. Horst, 93-1168, p. 6 (La.App. 1st Cir.5/20/94), 637 So.2d 720, 723. The discretion vested in the trier of fact is great, “even vast,” so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of the appellate court in reviewing general |18damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the “much discretion” of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Youn, 623 So.2d at 1261.
The parties do not seriously dispute that Nielsen recovered from the physical injuries he sustained as a result of the sinking of the barge. However, the record demonstrates that he has been diagnosed as suffering from post-traumatic stress disorder as a result of the tragic events forced upon him and the crew. At trial, Nielsen recounted the horrific events on the day of the sinking. On October 15, Hurricane Roxanne had maximum sustained winds of eighty-five miles per hour with wind gusts near 100 miles per hour, and it was producing thirty to thirty-five foot seas in the Bay of Campeche. Nielsen got up at 4:00 a.m. that day, because he was being “beat[ ] around” in his bunk, and the barge was “shuttering” from the effects of the weather. Nielsen reported to the galley, where he learned that the barge was actually moving backwards and that “it didn’t look good.” Nielsen attempted to go up on deck to assess the situation for himself, but he related that when he walked onto the deck by the saturation house, he was | ?,n“blasted” by a huge wall of water. He immediately went back down below deck.
However, by 10:00 a.m. that morning, all hands were ordered to immediately put on life preservers, report on deck and position themselves at designated life raft stations. Nielsen related that when he and the others reached the deck, the rain was pelting against them, and they were getting “smashed” by the pounding and continuous waves. After only one hour, the men could not take the weather conditions by the life raft stations. Thus, throughout the course of the day, Nielsen and others attempted to reposition themselves on deck in whatever manner possible to protect themselves from the brunt of the weather. However, the force of the waves tore up equipment on the barge, and by early afternoon, the barge was listing noticeably on the starboard stern side.
In an attempt to protect themselves from the wind, driving rain and waves, which Rountree described as “monstrous,” Nielsen and some of the other divers decided to move to the saturation house. Although they made it to the saturation house, as they were sitting inside, the twenty-foot by thirty-foot door of the saturation house was ripped off. At that point, water began pouring into the saturation house. Thus, the men had to move again. At that point, the waves were coming up past mid-deck, and oil drums and other equipment that had been welded and secured down were floating around.
As the situation became increasingly desperate, Nielsen and the other divers *159 decided to try to move up to the bow to keep out of the seas. However, Nielsen related that they did not know if they could make it to the bow, because the water had cut them off. Eventually, at approximately 4:30 or 5:00 p.m., they did make it to the bow.
121 At about that time, the men were told to abandon ship, and according to Nielsen, from that point on, “it was just chaos.” One deck foreman was telling everyone to jump in the water, while at the same time, another deck foreman was telling everyone, “No, no, don’t jump. You don’t have to jump.” Nielsen stated that at that point, it was “every man for himself.”
Nielsen did not jump immediately. He was afraid for his life and did not want to jump. He saw individuals who had jumped being pushed under the barge by the waves. Others who had jumped were being hit in the head by objects being thrown overboard by crew members still onboard who wanted something to grasp onto when they jumped. Eventually, after the barge was hit by a series of strong waves, it took another heave, the crane on deck let out a “horrendous groan” as it broke loose, and Nielsen heard two loud explosions as the gas tanks exploded. At that point, Nielsen knew that he had to jump to save himself or risk being drowned as the barge went down.
In an effort to get closer to the water, Nielsen climbed down the railing on the side of the barge until he was approximately twenty-five to thirty feet from the water. Nielsen then jumped into the seas, injuring his shoulder as he hit the water. Nielsen was then picked up by a wave and was “slammed and rolled and slammed.” He related that the waves would pick him up, hold him under and shake him a “like a rag doll.” He only had enough time to catch a breath before another wave would pick him up and pull him under.
While fighting to survive the waves, Nielsen began swimming toward a life raft, and he eventually made it to the raft. When questioned by defense counsel as to whether he had in fact been in the water for only ten minutes before reaching a life raft, Nielsen responded, “Yeah, but it’s not only ten | ^minutes. It’s ten minutes of hell, sir, but yes; it was only ten minutes.” The raft that Nielsen reached was upside down with water pooling in the middle, and he and approximately seventeen others were “crammed in there just holding on for dear life.” With each wave, the raft would “get[] vertical,” and everyone was screaming in fear for their lives. Nielsen knew that if he lost hold of the raft, that would have been it.
After fighting the waves for a couple of hours in the raft, Nielsen and the others were spotted by the MTV NORTH CAROLINA.[8] By this time, night had fallen, and the vessel shined a light on the men in the raft. However, as the vessel got closer, Nielsen began to wonder if it had in fact seen them. He related that he looked up in the air and saw forty feet of hull thirty-five feet above his head. At that point, Nielsen thought they were going to be crushed, so he just turned his head into the raft.
Despite his fears of being crushed, Nielsen felt a splash on the back of his neck, and when he looked up, he saw a tire. He grabbed onto the tire, and climbed up onto the boat. Thereafter, Nielsen assisted in the rescue efforts, helping to pull individuals out of the water.
While Nielsen did not personally pull any of the drowned bodies onto the deck of the M/V NORTH CAROLINA, he related that during the rescue operations, he grabbed a man who was “floating in the *160 water, and his eyes are open, and his mouth’s open, and water is just washing over his face.” Nielsen had to get assistance from another to help get the man on deck because he was “dead weight.” According to Nielsen, after they pulled the man onto the deck, the man “belly flops up on deck, and he projectile | ^vomits, and he stands up and walks away.” He testified that this particular experience had such an impact on him that he could no longer “deal with the situation.” Thus, he returned to half-deck to help spot people in the water, as he was unable to continue in his efforts to pull individuals out of the water.
Nielsen further related that he and others assisting in the rescue operations aboard the M/V NORTH CAROLINA saw a dead body floating in the water. He and the others looked to the captain, who, according to Nielsen, stated to them, “listen, we got [sic] to get the people that still have a fighting chance.” Thus, the captain told them to leave the body behind.[9]
Nielsen expressed that abandoning that body in the water has left him with feelings of guilt and anguish that they left someone behind out there and that retrieving the body was something they should have done. He testified that he continues to relive this experience in his dreams. Clearly, these two particular events have profoundly affected Nielsen since the accident.
Nielsen additionally related that during the rescue, he was watching the captain screaming, watching the waves and watching people get “smashed” by the waves. According to Nielsen, the individuals they were picking up out of the water were getting “smashed” all of the way up to the wheelhouse and would be left lying on top of the deck winches.
At around 10:00 or 11:00 p.m., a decision was made to discontinue rescue operations due to the extensive damage sustained by the other vessel, |Mthe M/V CAPTAIN JOHN. Thus, although there were some individuals unaccounted for, the two vessels started to head back to port in Ciudad del Carmen. Due to the heavy seas, it took the vessels approximately twenty hours to make it to port. During the trip into port, Nielsen and the men continued to fear for their lives.
After the survivors arrived back in Ciu-dad del Carmen, transportation was arranged for them to return home. Nielsen immediately flew to Texas to see his son, Cassius. Nielsen testified that while in Austin, he was “wound up very tight, like I was going 90 million miles an hour, and everything around me was just sitting still.” He felt like he was “zooming,” and he was hysterical and crying. He related that he went to a clothing store to purchase some clothes, but when he could not decide what he wanted, he starting “bawling” in the store. He was having difficulty functioning and sleeping, and he felt like he was “out of [his] mind.” He kept experiencing flashbacks where he was reliving the ordeal.
Nielsen then returned to New Orleans, for a “celebration” dinner organized by McDermott for the survivors. At that time, Nielsen related to Terry that he was experiencing emotional problems. Terry indicated to Nielsen that McDermott would support him in any way it could.[10]
*161 Thereafter, Nielsen began treatment with Dr. Adrian Blotner, a board-certified psychiatrist. When Dr. Blotner first examined Nielsen on | ^November 10, 1995, he diagnosed Nielsen as suffering from post-traumatic stress disorder.[11] Since that visit, Dr. Blotner has treated Nielsen on a monthly basis with therapy sessions and anti-depressant medication. At times throughout the treatment, when Nielsen has been exposed to stimuli triggering memories of the event, Dr. Blotner has had to increase the dosage of Nielsen’s medication. The stimuli triggering his relapses included such things as seeing a boating accident on television, hearing an electrical transformer explode, flying in an airplane, driving in the rain, and taking his son on a fishing trip on shore.
At his deposition on March 9, 1998, Dr. Blotner opined that Nielsen was permanently and totally disabled from working on the open water and that he would continue to need psychiatric care for approximately two more years to deal with his symptoms. As of the time of trial, Nielsen stated that while his symptoms are not as severe, he continues to suffer from flashbacks, nightmares, general paranoia and anxiety.
Based on the foregoing and the record as a whole, we conclude that the trial court’s award of general damages for the particular injuries suffered by the plaintiff under these particular facts and circumstances is neither abusively high nor abusively low. Because we find no abuse of the trial court’s discretion in making this award, we decline to disturb it on appeal.
These arguments likewise are without merit.
| avLoss of Earnings, Past and Future (McDermott’s Assignments of Error Nos. 14, 15, 16, 17, 18, 19, 20, 21, 22 & 23)
The trial court concluded that Nielsen had sustained significant loss of earnings as a result of his inability to return to his career as a diver. McDermott asserts that the trial court’s award of loss of past and future earnings must be reversed, contending it is based upon several erroneous factual findings. McDermott further contends that the trial court erred in relying on the testimony of Dr. George Randolph Rice, Nielsen’s expert economist, which allegedly was based upon erroneous assumptions.
In Culver v. Slater Boat Co., 722 F.2d 114, 117 (5th Cir.1983) (on rehearing en bane), cert. denied sub nom., Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 and St. Paul Fire & Marine Insurance Company v. Culver, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984) (Culver II), the United States Fifth Circuit Court of Appeals set forth the method to be used in calculating claims for lost earnings. The court stated that the calculation involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage and discounting that amount to its present value. Culver II, 722 F.2d at 117. The court *162 further stated that the calculation of the lost-income stream begins with the gross earnings of the injured party at the time of injury, and to that amount, other income incidental to work, such as fringe benefits, should be added. From this figure, income tax and work expenses are subtracted. Culver II, 722 F.2d at 117.
While the court stated that the lost income stream begins with consideration of the employee’s gross wages at the time of injury, it went on to state as follows:
| i,7Even in a non-inflationary economy, earnings of a worker “tend to inflate” from the operation of a number of factors, “some linked to the specific individual and some linked to broader societal forces.” The operation of both kinds of influences should be considered to reach the first stage in calculating an appropriate award, an estimate of what the lost stream of income would have been “as a series of after-tax payments, one in each year of the worker’s expected remaining career.” (Footnote omitted).
Culver II, 722 F.2d at 117, citing Jones & Laughlin Steel Corporation v. Pfeifer, 462 U.S. 523, 535-536, 103 S.Ct. 2541, 2549-2550, 76 L.Ed.2d 768 (1983). Moreover, the court maintained that evidence about the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other individual and societal factors continue to be admissible. Culver II, 722 F.2d at 122.
In the instant case, we conclude that the record amply supports the trial court’s decision to accept the $60,000.00 figure used by Dr. Rice as Nielsen’s annual income as a diver. Nielsen graduated from dive school in December of 1983 and began working as a tender. In 1987, he “broke out” as a diver. Nielsen continued to work as a diver and performed saturation work until late 1993, when he temporarily left the diving industry for approximately one and one-half years to pursue other endeavors. Thereafter, in July of 1995, Nielsen was hired by McDermott as a class II diver and worked aboard the DLB 269 for approximately three months prior to its sinking on October 15, 1995.
At trial, Dr. Rice explained that if he annualized Nielsen’s 1995 earnings from McDermott, the figure would have exceeded $100,000.00. Instead of using this figure, Dr. Rice computed Nielsen’s loss of earnings on an average income of $60,000.00 per year, a figure which is supported not only by Nielsen’s earnings in the three months before this incident, but also | gaby the evidence of earnings of other divers who, like Nielsen, were listed by McDermott as divers who had performed saturation work in 1995.
McDermott contends that Dr. Rice’s calculations are flawed, because he assumed that Nielsen had only been paid by McDermott through the date of the accident, when in fact McDermott had paid Nielsen through December 4, 1995. In support of its claim that it paid Nielsen through December 4th, McDermott relies upon an October 23, 1995 letter sent by McDermott to Nielsen and a copy of a check allegedly sent to Nielsen with the letter. In the letter, McDermott states that the check represented payment of wages for the period of October 19, 1995 through December 4, 1995. However, the copy of the check stub indicates that the check covered the pay period of October 17,1995 through October 23,1995.
Nonetheless, even accepting that this check represented payment of wages to Nielsen for an approximate six-week period following the accident, annualization of Nielsen’s year-to-date earnings prior to that payment would still produce a figure greatly in excess of the $60,00.00 income figure utilized by Dr. Rice in his calculations. Thus, if Dr. Rice had based his calculations on annualization of Nielsen’s actual wages earned for the three-month period prior to the sinking of the barge, the calculation of loss of earnings, both past and future, would have been consider *163 ably higher than that awarded by the trial court.
Awards for loss of income are speculative by nature and cannot be calculated with mathematical certainty. Therefore, the trial court necessarily must have much discretion in fixing lost wage awards. Jenkins, 96-2504 at p. 12, 705 So.2d at 1191. Applying these legal precepts and considering the foregoing, we find no abuse of the trial court’s discretion.in accepting Dr. Rice’s calculations as to Nielsen’s lost income stream as a diver.
lasMoreover, we find no merit in McDermott’s complaint that the trial court erred in finding that Nielsen could have become a diving supervisor at the end of his diving career. As stated above, evidence of the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other individual and societal factors are appropriate factors to consider in determining a wage loss claim. Culver II, 722 F.2d at 122. In the instant case, the trial court’s conclusion that Nielsen could have progressed to the position of diving supervisor at the end of his diving career is amply supported by the evidence of Nielsen’s personal abilities and past experience.
The record establishes that while in diving school, Nielsen had received academic instruction to prepare him for supervisory work. After graduating from dive school in December of 1983, he progressed from the position of dive tender to diver. Additionally, prior to going to work for McDer-mott, Nielsen had supervised a saturation job in India. In the months that he was employed by McDermott, Nielsen also performed saturation dives for McDermott. Given these facts, we find no error in the trial court’s conclusion that Nielsen was an able and hard-working individual and had the capacity to rise in his profession to the supervisory position of diving supervisor, but for these life-altering events. See Hollenbeck v. Oceaneering International, Inc., 96-0377, pp. 16-19 (La.App. 1st Cir.11/8/96), 685 So.2d 163, 173-174, writ denied, 97-0493 (La.4/4/97), 692 So.2d 421.
After computing Nielsen’s lost income stream in the diving industry, Dr. Rice then offset this loss with an amount he determined Nielsen could earn in the future as a registered nurse. After accepting that he could not return to work on the open waters, Nielsen decided to pursue a career in nursing. As of the time of trial, he still had three years of nursing school to 1 incomplete. Given this information, Dr. Rice assumed that in three years from the date of trial, Nielsen would have the ability to earn $14.00 per hour as a registered nurse.
McDermott contends that the trial court erred in accepting Dr. Rice’s calculations of Nielsen’s potential earnings as a nurse. Rather, McDermott contends that the trial court should have accepted evidence presented by McDermott, demonstrating that Nielsen could earn $15.00 to $15.75 per hour upon graduation. Initially, we note that Dr. Rice testified that he obtained the $14.00 per hour figure used in his calculations from a vocational rehabilitation report supplied to him by McDermott. Moreover, although Nielsen had maintained a high grade point average, he had never carried a full-time class schedule until he was actually accepted into nursing school. He related that in nursing school, he was taking fifteen hours per semester, and it was causing him “quite a bit of anxiety.” Given these facts, and the relative uncertainty as to Nielsen’s ability to complete nursing school and obtain subsequent employment, given his psychological and emotional problems, we find no abuse of the trial court’s discretion in its decision to accept the more conservative estimate as to Nielsen’s potential future earnings.
Likewise, we also find no abuse of discretion in the trial court’s award for loss of fringe benefits. The trial court accepted Dr. Rice’s calculations as to the value of the fringe benefits lost by Nielsen based *164 on the benefits that McDermott offered to its employees. The trial court then divided that figure in half to account for anticipated fringe benefits that would be available to Nielsen as a nurse. McDermott contends that it presented evidence that Nielsen would have comparable fringe benefits available to him as a nurse, 131 and, consequently, there should have been no award for loss of fringe benefits.
Nancy Favalora, a vocational rehabilitation counselor hired by McDermott, testified that fringe benefits are available to nurses. However, neither she nor any other witness testified that all benefits that had been available to Nielsen as a diver would likewise be available to him as a nurse. Given the uncertainty of the fringe benefits that will actually be available to Nielsen in the event he graduates from nursing school, we find no abuse of the trial court’s discretion in the award made for loss of fringe benefits.
Considering the foregoing, we find no error or abuse of discretion in the trial court’s awards of past lost earnings, future loss of earnings and loss of fringe benefits.[12]
PREJUDGMENT INTEREST (Nielsen’s Assignment of Error No. 2)
Finally, Nielsen asserts that the trial court erred in failing to award him prejudgment interest on the awards for past damages. In the instant case, the trial court concluded in its reasons for judgment that prejudgment interest is not allowed in a Jones Act case. Consequently, the judgment awarded interest on the entire award from the date of judgment only.
When a Jones Act case is tried as an admiralty case without a jury, as in the present case, the trial court has discretion as to whether to award prejudgment interest on past damages. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 14 (La.7/2/96), 676 So.2d 89, 97. Thus, the trial court herein erred as a matter of law in its conclusion that prejudgment interest is never allowable in Jones Act cases, and we must now determine if an award of prejudgment interest is appropriate under the facts of this case.
As a general rule, allowable prejudgment interest should be awarded in admiralty cases — not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. Discretion to deny prejudgment interest is created only when there are “peculiar circumstances” that would make it inequitable for the losing party to be forced to pay prejudgment interest. See Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir.1980).
Because none of the jurisprudential peculiar circumstances appear in the record before us, we conclude that the trial court erred in failing to award prejudgment interest on the awards for past damages. Thus, the judgment is amended to provide for the award of prejudgment interest on all such awards. However, because the judgment does not delineate between past and future damages, we must remand this matter for apportionment of the damage *165 award by the trial court into past and future components and for calculation of prejudgment interest accordingly. See Crane v. Diamond Offshore Drilling, Inc., 99-166, p. 27 (La.App. 5th Cir.9/15/99), 743 So.2d 780, 796.
CONCLUSION
For the above and foregoing reasons, the October 9, 1998 judgment of the trial court, in favor of Nielsen and against McDermott, is amended to provide that prejudgment interest is awarded on the portion of the awards | ^representing past losses. The matter is hereby remanded to the trial court with instructions to apportion its award to delineate between past and future losses and to calculate prejudgment interest accordingly. In all other respects, the judgment is affirmed. Costs of this appeal are assessed against defendant, J. Ray McDermott, Inc.
AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS.

. J. Ray McDermott, Inc. and McDermott Underwater Services will be referred to herein collectively as "McDermott.”

. The court found no basis to impose liability upon McDermott for the alleged unseaworthiness of the DLB 269 in that the vessel was owned and operated by CCC, not McDermott.

. Given the numerosity and detailed specificity of McDermott's assignments of error, we will not address each assignment of error individually. Rather, they will be addressed throughout the text of this opinion under the applicable topics.

. We thus pretermit discussion of assignments of error number one and number three to the extent that McDermott argues that McDermott could not have ordered the Northbank vessels to tow the barge to safe harbor because it did not own, operate or control the movement of the barge.

. McDermott also assigns error to the trial court’s characterization of Burgueno as a "project manager” and its finding that Bur-gueno had supervisory authority over McDer-mott personnel aboard the barge. Burgue-no’s position with McDermott was diving coordinator in Ciudad del Carmen. As such, he was responsible for assisting in planning of the work and determining the number of divers and types of equipment needed for tire job. Burgueno also handled payroll for McDer-mott and billing to CCC for the services provided to it by McDermott.
Additionally, while Rountree was the offshore supervisor of the dive crew aboard the barge, Rountree clearly testified that Burgue-no was, in turn, his supervisor. Rountree further testified that Burgueno had input in decisions made regarding the dive crew aboard the barge, such as which divers would perform saturation dives. Burgueno also had authority over whether or not to approve supplies requested by Rountree and whether or not to allow divers to come to shore for personal reasons. Given these facts, we find no manifest error in the trial court's characterization of Burgueno’s position and duties as those of a project manager or in its conclusion that he had supervisory authority over the dive crew aboard the barge.

. McDermott contends on appeal that the trial court erred in referring to a "joint operating agreement” in its reasons for judgment where the only document of record was the shareholders’ agreement. It further contends that the record fails to establish that it assumed any responsibilities under the shareholders' agreement previously entered into by CCC, Grupo and OPI, simply by virtue of its merger with OPI.
At the outset, we note that the testimony at trial established that McDermott had assumed OPI’s responsibilities with regard to the operation of the barge in conjunction with CCC. McDermott had also appointed four members to the Board of Directors of CCC, as contemplated by the shareholders’ agreement. Additionally, the shareholders’ agreement itself specifically required the transferee of any CCC stock (in this case McDermott) to assume all of the duties and obligations of the transferor shareholder (OPI) under the shareholders’ agreement before the transferee shareholder (McDermott) would be deemed a shareholder of CCC stock. Thus, given McDermott's assumption of OPI's duties to provide dive crews to CCC, its appointment of four members to CCC’s Board of Directors and the fact that under specific terms of the shareholders’ agreement, McDermott could not be deemed to be a shareholder of CCC stock until it assumed OPI's duties and obligations under the agreement, we conclude that the record amply supports the conclusion that McDermott assumed OPI’s responsibilities as outlined in the shareholders’ agreement.
Moreover, as stated above, McDermott supervisory personnel referred to the arrangement between McDermott and CCC with regard to operations aboard the barge as the "joint operating agreement.” Thus, we conclude that any error by the trial court in referring to the shareholders’ agreement as the "joint operating agreement” is harmless.

. With regard to the flow of information between the barge and McDermott's onshore personnel, McDermott contends that the trial court erred in finding that, at all relevant times, the barge was in radio and fax communication with McDermott's Bayou Black office. We note that while the trial court referred to the Bayou Black office, the evidence of record indicates that the communications at issue occurred among the barge, Burgueno' in Ciudad del Carmen, and personnel in McDermott's Morgan City office.
Specifically, Rountree testified that as diving superintendent aboard the barge, he reported to Burgueno on a daily basis regarding the progress of the job. He stated that he communicated with Burgueno on the VHF radio daily. Rountree further testified that when he was attempting to obtain an emergency decompression schedule a few days pri- or to the sinking, he communicated with personnel in the Morgan City office via single side-band radio.
Additionally, Burgueno confirmed that in addition to radio communication, he had fax communication with the barge, as well as with the Morgan City office. John Hart, McDermott’s diving manager in Morgan City, also acknowledged that, at all times, he had access to what was occurring on the barge relative to the dive crew and that he spoke with Burgueno as many as four or five times a day about the activities aboard the barge. Thus, while all communications may not have been directly between the barge and the Morgan City office, the record supports the finding that the barge was in radio and fax communication with the Morgan City office. As the record demonstrates, communication with *157 the barge continued until 5:05 p.m. on the day of the sinking, when all communications with the barge ceased after the barge was lost.

. While McDermott attaches great significance to the fact that Nielsen was in the life raft for only a couple of hours, the record clearly demonstrates that the events giving rise to his damage claim lasted in excess of thirty hours, i.e., from the time he was awakened in the early morning hours of October 15 by rough seas and subsequently ordered on deck until the M/V NORTH CAROLINA finally made it to port.

. The M/V CAPTAIN JOHN, in addition to rescuing many individuals, did retrieve some of the dead from the water during the rescue operations. McDermott complains on appeal that the trial court erred in detailing the experience of those rescued by the M/V CAPTAIN JOHN in its reasons, because Nielsen was never aboard that vessel. However, we find that the trial court was merely attempting to portray the entirety of the events that occurred that day. We find nothing in the trial court’s reasons to indicate that its compleLe recitation of the events of that tragic day in any way improperly affected its assessment of the amount of general damages due to Nielsen herein.

. McDermott complains that the trial court erroneously characterized Nielsen's complaints to Terry by stating in its reasons for *161 judgment that Nielsen had reported to Terry that he was having "extreme emotional problems.” At trial, Nielsen testified that he had related to Terry that he “wasn’t right, something was going on with me and I needed to go see somebody.” Terry similarly recalled that Nielsen had approached him and indicated that he was having emotional problems and that he did not know "what the hell [was] wrong.” Given this testimony, we find no manifest error in the verbiage used by the trial court to characterize Nielsen’s complaints to Terry.
Additionally, with regard to McDermott’s other challenge to the trial court’s reasons, regardless of whether Nielsen also informed Riddle that he was suffering from emotional problems following the sinking of the barge, McDermott clearly was aware that Nielsen was having psychological problems, based on Nielsen’s conversation with Terry.

. Although McDermott contends that Dr. Blotner prematurely diagnosed Nielsen’s condition, even McDermott's own expert, Dr. Richard Roniger, agreed that Nielsen suffered from post-traumatic stress disorder as a result of the events surrounding the sinking of the DLB 269.

. McDermott further contends that it is entitled to a credit of $16,000.00 against the award for lost earnings for advances it made to Nielsen. At the outset, we note that McDermott did not plead in its answer that it was entitled to a credit or offset. An affirmative defense, which constitutes a defense to the merits of a claim asserted in the petition and limits or relieves the defendant of liability, must be set forth in the defendant's answer. LSA-C.C.P. arts. 1003, 1005; Hogan v. State Farm Automobile Insurance Company, 607 So.2d 747, 751 (La.App. 1st Cir.1992).
Additionally, we note that when Nielsen was asked at trial if McDermott had in fact advanced him sums in the amount of $16,-000.00, Nielsen disputed the amount as claimed. Nonetheless, McDermott offered no evidence to support its contention that it had advanced Nielsen this sum. Thus, on the record before us, we find no error by the trial court in refusing to award McDermott a credit of $16,000.00.