705 So.2d 1184 (1997)
Daniel JENKINS
v.
SONAT OFFSHORE U.S.A. INC.
No. 96 CA 2504.
Court of Appeal of Louisiana, First Circuit.
December 29, 1997.
*1186 Gordon J. McKernan, Baton Rouge, David Robertson, Austin, TX, Terry G. Breaux, Franklin, for Plaintiff Appellee Daniel Jenkins.
Timothy W. Cerniglia, New Orleans, H. Alston Johnson, III, Baton Rouge, for Appellant Defendant Sonat Offshore Drilling, Inc.
Before FOIL, WHIPPLE and KUHN, JJ.
FOIL, Judge.
This appeal arises out of a suit for damages under the Jones Act and general maritime law. We amend in part and affirm as amended.

FACTS
Plaintiff, Daniel Jenkins, was employed as a roustabout aboard the DF-85, a jack-up drilling rig which was owned and operated by defendant, Sonat Offshore U.S.A., Inc. (Sonat). On or about October 23, 1992, a supply boat, the M/V MR. KENT, pulled alongside the rig to deliver a load of cargo. Several Sonat employees, including Jenkins, were assigned to off-load some casing from the supply boat. This procedure involves off-loading two joints of casing at a time using a rig crane. Two of the men were assigned to work on the supply boat, hooking the crane's slings to the casing. Jenkins remained aboard the rig to guide the casing into place on the pipe rack and unhook the slings from the casing. Toward the end of the operation, Jenkins was injured when he allegedly fell off the stack of casing and landed on the rig deck. No one witnessed the accident.
Jenkins subsequently underwent a cervical diskectomy and an anterior cervical fusion on April 19, 1993. On April 28, 1994, he filed the instant suit for damages against Sonat, setting forth two theories of recovery, Jones Act negligence and unseaworthiness under general maritime law. Sonat answered the petition, generally denying the allegations and alleging that Jenkins was comparatively negligent.
After a trial on the merits, the trial court determined that Sonat was negligent and that the DF-85 was unseaworthy. The court awarded Jenkins damages of $850,000.00, which consisted of $200,000.00 for physical pain and suffering and disability, $50,000.00 for mental anguish and distress and loss of enjoyment of life, and $600,000.00 for loss of income and benefits, together with legal interest from the date of judicial demand.
From this adverse judgment, Sonat appealed, challenging the trial court's liability and fault determinations, several of its evidentiary rulings and quantum determinations, and the court's assessment of prejudgment interest on the entire amount awarded.

LIABILITY
Sonat argues on appeal that the trial court erred in concluding that it was negligent and that the DF-85 was unseaworthy. It also asserts that the court erred in failing to allocate any fault to Jenkins.
In Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96); 676 So.2d 89, 96, the Louisiana Supreme Court directed state appellate courts to apply Louisiana's manifest error standard of review to factual determinations made in Jones Act and general maritime cases. Claims based on negligence and unseaworthiness are separate and distinct, but the factfinder's conclusions as to each are treated similarly on review. These findings of fact may not be disturbed unless they are manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Under Stobart, in order to reverse a factual determination, an appellate court must find (1) a reasonable factual basis does not exist in the *1187 record for the finding and (2) the record establishes that the finding is clearly wrong or manifestly erroneous. Id.
The Jones Act, 46 U.S.C.App. § 688, provides a cause of action in negligence for a seaman injured in the course of his employment against his maritime employer. The Jones Act contains a liberal causation requirement. A seaman is entitled to recover if the employer's negligence played any part, even the slightest, in producing the injury. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir.1997). Under the Jones Act, both the employer and the seaman are obligated to act with ordinary prudence under the circumstances. Id. at 335, 339.
To be seaworthy, a vessel and its appurtenances must be reasonably suited for the use for which they were intended. The owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. Liability under the doctrine of unseaworthiness does not rest upon fault or negligence. A more stringent standard of causation is required in an unseaworthiness claim than in a Jones Act claim. Specifically, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about the injury and that the injury was either the direct result or a reasonably probable consequence of the unseaworthiness. Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir.), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988).
In the present case, the trial court found that Sonat was negligent and the vessel was unseaworthy on three bases: (1) a sufficient crew was not provided for the offloading operation; (2) barite was allowed to settle on the casing during the offloading operation; and (3) adequate lighting was not provided on the pipe deck where the offloading took place. We note that a finding of any one of these bases would be sufficient establish liability on the part of Sonat. Because we find no manifest error in the court's finding that Sonat failed to provide an adequate crew, we need not address the issues presented by the other two bases of liability.
Daniel Jenkins testified at trial that in all of his career, he had served as a roustabout only ten to fifteen times. On the day of the accident, they began the offloading operation with only three people, whereas usually there are four. Two men, Hugh Broussard and Randall Hodges, were down on the supply boat hooking up the casing, and he was alone on the rig unhooking it. After about an hour, Les Suto came to help him; however, Suto left to perform another task before all of the casing had been unloaded. Another load was coming from the supply boat, so Jenkins climbed up onto the top of the stack of casing, which was five to eight feet high, to position another load. He pushed the casing into place and unhooked the slings. According to Jenkins, he turned around and saw Suto by the shaker area, preparing to back-load something onto the supply boat. Jenkins decided to get down and go help Suto, so that Suto could return and help him. Jenkins walked to the edge of the casing to climb down and, as he turned around, his right foot slipped out from under him, his left foot went out over the casing, and he fell to the deck, hitting his left shoulder blade on the casing.
In its written reasons for judgment, the trial court found that Jenkins was mentally and physically slow. Despite his mental limitation, however, the court stated it found him to be a credible witness. The court went on to find that offloading casing safely requires two people on the pipe deck. The record shows that this finding is supported by the testimony of numerous witnesses.
Les Suto, who assisted Jenkins in the offloading procedure, testified that he was certain Jenkins had not started unloading before he got there because one man cannot handle that job. Suto stated that one man should never handle casing pipe by himself. Two people are needed to stabilize both ends of the pipe so it does not start spinning. Suto further stated that, if you cannot reach the tag line, you have to climb up on top of the casing. He testified that, when he quit helping Jenkins, he was under orders to do so. To his knowledge, every piece of pipe had been offloaded from the supply boat. However, *1188 he did not look on the boat, so there could have been some pipe remaining.
Hugh Broussard was a roustabout on the Sonat 85 who was offloading the casing from the supply boat with Randall Hodges on the day of the accident. Broussard testified that it is necessary to have two people to unload the casing on the pipe deck.
Calvin Barnhill, a registered professional petroleum engineer, testified for the plaintiff in a post-trial deposition as an expert in offshore drilling operations. He stated that he reviewed the other depositions and documentary evidence and also attended the trial. Barnhill opined that, to safely and efficiently offload casing from a supply boat, the proper number of people to execute this operation would be four, from start to finish. He stated that the fact that someone would have to climb up and down on the stack is not inherently unsafe. Rather, Barnhill felt that if Suto left and Jenkins was the only person involved in the operation at that time, the most efficient place for him to be would be physically on top of the stack of casing. Barnhill testified that when Suto left to go to another job, it became an unsafe procedure at that point because it was his opinion that Jenkins did not have the aptitude to be working the casing by himself.
After reviewing the testimony, we find that it clearly supplies a reasonable factual basis for the trial court's conclusion that Sonat failed to provide an adequate crew for the offloading operation. Further, the court's findings that this constituted Jones Act negligence and rendered the vessel unseaworthy are not clearly wrong. Accordingly, we will not overturn the trial court's conclusion that Sonat was liable in this case.
Sonat also argues that the trial court erred in finding Jenkins free from fault. It asserts that Jenkins did not exercise sufficient caution in backing down the stack of casing.
As stated previously, a seaman's duty is to act with ordinary prudence under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d at 339. After hearing all of the evidence, the trial court did not apportion any fault to Jenkins, apparently determining that Jenkins had performed his work in a prudent manner. A review of the record shows that it supplies a reasonable factual basis for that finding. In fact, there was no evidence that Jenkins' actions were improper. As such, we cannot say that the finding of ordinary prudence on the part of Jenkins was clearly wrong. Therefore, the trial court's determination in this regard will not be overturned.

EVIDENCEFUNCTIONAL CAPACITY EVALUATION
Sonat contends the trial court erred in admitting into evidence a Functional Capacity Evaluation (FCE) of Jenkins which was performed by Bobby Roberts. Specifically, Sonat urges that Roberts' FCE should have been held inadmissible because of the lack of any evidence that the ERGOS machine utilized by Roberts to obtain the FCE produced an accurate result as required by La. C.E. art. 901 B(9). Sonat argues that by erroneously admitting Roberts' FCE into evidence, the trial court could not make a proper assessment of Jenkins' actual functional abilities in order to determine true future wage loss.
We find that Sonat has not shown that the admission of the challenged evidence had a prejudicial effect on the outcome of this case. Our review of the record shows that the trial court heard ample testimony attacking the methodology of Roberts' FCE. Moreover, we feel that the alleged deficiencies in the reliability and accuracy of the report were taken into account by the trial court when deciding what weight to give the evidence. Finally, as discussed next under the damages portion of this opinion, the trial court was presented with sufficient evidence in addition to Roberts' FCE upon which to base its determination of future lost income. Accordingly, Sonat's argument lacks merit.

DAMAGES
First, Sonat contends the trial court's award of $250,000.00 for pain and suffering, mental anguish and loss of enjoyment of life is excessive and is not reasonably supported by the record. It claims that the great majority of awards for a similar type of injury *1189 suggest that $125,000.00 to $150,000.00 is the maximum affirmable award that could be given.
It is well settled that the trier of fact has much discretion in awarding damages. La. Civ.Code art. 2324.1. The Louisiana Supreme Court has described this discretion as "great" and even vast, and declared that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when an award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Id.
Jenkins was only thirty-six years old at the time of this accident, and had never had any back or neck problems. Immediately after the accident, he felt a little pain in his shoulder blade, but did not think he was hurt at that time. He continued working and completed his shift. Jenkins did not report his accident until a day or two later because he did not think he was hurt that badly and thought he could "shake it off." He finally filled out an accident report with the barge engineer, Larry Harden. Jenkins told Harden he did not know what caused his injury because a lot of people were getting laid off at the time and he did not want to be one of them. The next day, on October 27, a helicopter flew him in to the emergency room. Jenkins complained that his left shoulder blade was hurting and was putting his left arm to sleep. He gave a history of having fallen and landing against the casing on a job. X-rays were taken and Jenkins was given a neck brace to wear.
Jenkins saw the company doctor, William H. Johnson, the next day. He gave a history of falling backwards striking his left shoulder blade on some casing. Jenkins complained of discomfort and some tingling in his left arm. An examination revealed slight tenderness to the medial side of the scapula and full range of motion in the shoulder itself. Dr. Johnson felt that Jenkins sustained a contusion to the left posterior shoulder over the scapula. He placed Jenkins on anti-inflammatory medication and recommended that he return to work on light duty. Dr. Johnson saw Jenkins again on November 2, at which time he complained of discomfort in the muscles of the left scapula.
Jenkins next saw Dr. George A. Murphy, on November 10, 1992. He indicated he came in because of neck problems that started when he fell off some casing offshore. An x-ray revealed early degenerative change, but no evidence of fracture, dislocation or subluxation. Dr. Murphy felt Jenkins had a herniated cervical disc, and recommended that he have an MRI scan of the cervical spine. The scan was done on November 13 and showed disc disease at multiple levels. The film also showed some disc protrusion which could not be dated; in other words, it could have occurred before, during or after the incident. He could not tell if there was any definite herniation. Dr. Murphy recommended continuing with conservative treatment since it had only been two weeks since the accident.
Jenkins was still symptomatic on December 1, 1992, so Dr. Murphy recommended an EMG and nerve conduction study. The test was performed on December 3, and revealed a left acute neurogenic atrophy at the C7-8 level. The nerves were showing some damage but Dr. Murphy felt that Jenkins could continue a little bit longer with conservative treatment. A subsequent myelogram and CAT scan performed on January 19, 1993, showed soft tissue effacement of the left C8 nerve root. At that point, Dr. Murphy felt that Jenkins was a good candidate for cervical surgery because he had not responded to conservative treatment. Dr. Murphy referred Jenkins to Dr. Harris because he was no longer performing surgery.
Dr. Mitchell Harris, an orthopedic surgeon, first saw Jenkins on February 2, 1993. Jenkins gave a history of falling off a five-foot stack of casing and landing on his left shoulder. He presented with pain between the shoulder blades and numbness in the left ulnar digits. The films Dr. Harris reviewed showed embarrassment of the left C8 nerve root, with a C6C7-T1 disc. Dr. Harris *1190 testified that, when discussing treatment options with a patient, he tries to get the patient to understand that even if the surgery is successful, they often will not be able to return to work because they represent a potential risk. He stated that being able to return to work was exceptionally important to Jenkins, which is why Jenkins consented to undergo another round of physical therapy after not improving the first time through. Accordingly, Jenkins underwent one month of exercise-based therapy and had some improvement when Dr. Harris saw him on March 2. He saw Jenkins again on March 23 and noted continuing improvement. Jenkins reported the hand pain and dysesthesia were gone, but he was still having neck complaints. Dr. Harris allowed him to go back to work, but suggested he continue working with the physical therapy program. When he next saw Jenkins on April 6, Jenkins was not doing well and had been told by his employer that he could not return until he was 100% recovered. Thereafter, Jenkins' pain became intolerable and he was admitted for surgery on April 19. The surgical procedure he underwent involves removing the disc between the bottom cervical vertebra and the top thoracic vertebra. Bone is then taken from the pelvis and put in the space where the disc once was. Jenkins was hospitalized from April 19-22.
After the surgery, Dr. Harris saw Jenkins from May, 1993, until January, 1994. Initially, he did quite well. His left hand and arm symptoms improved. However, in July, 1993, Jenkins began getting frustrated with the fact that it did not appear he would be able to return to work. Dr. Harris sent him to a psychiatrist for depression. The last time Dr. Harris saw Jenkins on January 11, 1994, his x-rays appeared normal and his left hand complaints had resolved completely, but he still had some shoulder pain. At that time, Dr. Harris felt that Jenkins was capable of returning to work of some type and encouraged him to do so.
Dr. Gene S. Fields, an orthopedist, first saw Jenkins on January 28, 1994, and saw him seven times thereafter. At the first visit, Jenkins complained of low back pain to a moderate degree. An initial examination revealed his range of motion was limited in flexion by about 40 percent. Extension was limited to only 10 percent. Right and left lateral bending was limited by 20 percent on either side. Axial compression was painful. The shoulder range of motion was full bilaterally. His lumbar examination was normal. On the second visit on March 1, there was not much change in his neck examination. On April 19, he was basically the same; however, he related a new complaint of numbness in the ulnar surfaces of his left hand and pain in the left scapula in the back of his neck. The next examination on May 20, 1994, revealed little change. Jenkins complained at that time of headaches. When Dr. Fields next saw Jenkins on August 26, he voiced the same complaints of neck pain. Dr. Fields testified that, at that point, he was just trying to treat Jenkins' symptoms. In fact, after his last visit on October 12, 1994, the only treatment considered was for pain. Dr. Fields opined that, unless his condition deteriorated, another operation would not be entertained. An MRI taken in July, 1994, showed that Jenkins has disease at multiple levels in his back. Dr. Fields stated, however, that all of his symptoms seemed to be consistently related to the fusion he had in his lower neck. Based on the history he obtained, Doctor Fields concluded that Jenkins had a traumatically induced disc condition.
Dr. Stephen J. Flood, an orthopedic surgeon in practice with Dr. Fields, saw Jenkins on January 23, 1995. Dr. Flood testified that, throughout the course of his treatment of Jenkins, he consistently complained of pain in the neck, radiating into the left upper extremity, and headaches. Dr. Flood often administered trigger point injections in an attempt to alleviate Jenkins' pain. In a clinic note dated October 2, 1995, Dr. Flood made a diagnosis of cervical syndrome with residual radiculitis and headaches. At the time of his deposition, which was taken on October 11, 1995, Dr. Flood stated he would assign Jenkins a permanent partial impairment rating in the range of 15 to 20 percent for his cervical spine disease and persistent radiculitis. He opined that some of the conditions of Jenkins' spine as shown in the MRI are just as consistent with trauma as with a slow *1191 developing, long standing degenerative disease, and vice-versa. Specifically, Dr. Flood noted preexisting cervical disk disease at C4-5 and C6-7, but that the condition at the other levels was more consistent with trauma.
The record reveals that Jenkins underwent extensive physical therapy both before and after his surgery. The testimony of four physical therapists who treated Jenkins reveals that he consistently complained of neck pain, pain in his left shoulder blade and intermittent numbness in his left hand.
Jenkins testified that he continues to suffer from headaches and constant pain in his shoulder. He was depressed that he would never return to his offshore occupation. Jenkins is being treated and takes medication for his depression. His wife testified that the accident changed him. She stated that Jenkins went from being a happy, friendly person to a silent loner.
After a careful review of the record in light of the well established standard of review, we find that the trial court's award of $250,000.00 in general damages was not an abuse of its vast discretion. We therefore reject Sonat's request to decrease the award.
Sonat also complains that the award for lost wages is excessive. We disagree. Awards for loss of future income are speculative by nature and cannot be calculated with mathematical certainty. Therefore, the trial court necessarily must have much discretion in fixing lost wage awards. Martino v. Sunrall, 619 So.2d 87, 90 (La.App. 1st Cir.), writ denied, 621 So.2d 821 (La.1993).
The record reflects that Lamar B. Jones, an expert economist, prepared a report for the plaintiff, analyzing the extent of his economic losses. Assuming total disability with no return to work in the post-trial period, Jones calculated a loss of earnings based on a 1.0 percent wage growth ranging from a low of $556,859.00 to a high of $686,670.00. Based on a 3.79 percent wage growth, Jones calculated losses ranging from a low of $762,114.00 to a high of $939,772.00. Assuming that Jenkins could return to work at the minimum wage rate of $4.25 per hour, Jones calculated a low range of earnings losses from $369,294.00 to $499,105.00, and a high range from $574,549.00 to $752,207.00. Jones also calculated a loss of retirement benefits ranging from $91,037.00 to $199,119.00, and health care insurance replacement costs of $130,842.00.
Sonat's expert economist, Kenneth Boudreaux, also performed an analysis of Jenkins' loss of earnings. In calculating future losses, Boudreaux assumed that Jenkins could return to employment at either $6.00, $8.00, or $13.65 per hour as reported by Sonat's vocational rehabilitation expert. At a net of $6.00 per hour, Boudreaux calculated that future losses would range from $238,257.59 to $301,817.63, based on after-tax income and a regular work life. In contrast, at a net of $13.65 per hour, he calculated that future losses would range from $72,562.56 to $91,961.13.
Stephanie Chalfin, the plaintiff's vocational rehabilitation expert, met with Jenkins twice and also reviewed all of his medical records and the doctors' depositions. She administered an intelligence test to Jenkins which revealed a level at the low end of the average range. Chalfin testified that, based on everything she reviewed, she felt entry level jobs paying essentially minimum wage are what will be available to Jenkins in the future. She opined that people like Jenkins who have back or neck injuries are not employable offshore from a vocational standpoint.
Jennifer Palmer, Sonat's vocational rehabilitation expert, also met with Jenkins and reviewed the medical records in this case. She disputed the method of vocational assessment employed by Chalfin because the test does not measure reading comprehension. Palmer opined that Jenkins is an excellent candidate for job placement. She noted that he was in school getting his GED. Also, 62% of all types of jobs are in the sedentary to light category, which is the rating Jenkins received in the Mills Functional Capacity Evaluation. Palmer further noted that Jenkins was being trained through the Mississippi Rehabilitation Services. She testified that the starting range for what he was being trained for is $6.00 to $8.00 per hour and that there were four *1192 known openings of that type in his geographical area. On cross examination, Palmer agreed that Jenkins is incapable of returning to the heavy type of roughneck work that he did before the accident.
The record shows that at the time of trial, Jenkins was working at the rehabilitation center putting seals on light sockets. He earned $7.50 for each one thousand lights assembled. The first month he worked, he netted $159.00.
The trial court awarded Jenkins $70,350.00 for past lost income and benefits and $529,650.00 for future lost income and benefits. The court found that Jenkins was limited to light duty jobs earning little more than minimum wage. We conclude that the record supports this determination, particularly the report of Dr. Jones and the testimony of Ms. Chalfin. Considering the circumstances of this case, we cannot say that an award of $600,000.00 is an abuse of the trial court's discretion and decline to disturb the award.

PREJUDGMENT INTEREST
Sonat asserts that the trial court erred by awarding prejudgment interest on the entire damage award, claiming that interest is only due on those damages incurred in the past. We agree.
The record indicates that the trial court issued written reasons for judgment on February 29, 1996, awarding total damages in the sum of $850,000.00. Thereafter, the court issued supplemental reasons for judgment, wherein it noted that it had failed to distinguish pre-trial and post-trial damages in its original reasons. The court went on to separate the award "[i]n order to properly calculate interest." However, when the actual judgment was signed on June 26, 1996, it provided that interest would be calculated on the entire amount of damages from the date of judicial demand.
The issue presented here is governed by Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96); 676 So.2d 89. While the trial court in this case did not have the benefit of the Milstead decision, which was handed down after the instant judgment was rendered, the trial court apparently recognized that the proper calculation of interest depends on distinguishing between past and future damages. In Milstead, the plaintiff had recovered under both the Jones Act and general maritime law following a trial without a jury. The Louisiana Supreme Court first held that the issue of prejudgment interest on damages recovered under the Jones Act is governed by federal law. The court then held that, under federal law, when a Jones Act case is tried as an admiralty case without a jury (as in the present case), the trial court has discretion as to whether to award prejudgment interest on past damages but may not award prejudgment interest on future damages. Milstead, 95-2446 at pp. 15-16; 676 So.2d at 97.
Since the trial court in this matter separated the award into pre-trial and post-trial damages, we simply amend the judgment to provide that prejudgment interest is only awarded on the past damages which total $132,850.00.

CONCLUSION
For the reasons stated herein, the judgment of the trial court is amended to reflect that prejudgment interest is to be paid on past losses only. In all other respects, the judgment is affirmed. Costs are assessed to appellant.
AFFIRMED AS AMENDED.