886 So.2d 482 (2004)
Kentrell DORSEY
v.
J. RAY MCDERMOTT, INC.
No. 2003 CA 2264.
Court of Appeal of Louisiana, First Circuit.
June 25, 2004.
*485 Lawrence D. Wiedemann, New Orleans, Mauri Agosta, Labadieville, for Plaintiff/Appellant/Appellee Kentrell Dorsey.
Patricia A. Krebs, Allan C. Crane, New Orleans, for Defendant/Appellee/Appellant J. Ray McDermott, Inc.
Before: CARTER, C.J., PARRO, and GUIDRY, JJ.
CARTER, C.J.
The plaintiff, Kentrell Dorsey, brought suit against his employer, J. Ray McDermott, Inc. (McDermott), for injuries sustained offshore. Dorsey sought damages based on Jones Act negligence and the maritime doctrines of unseaworthiness and maintenance and cure.
The trial court signed a judgment on June 13, 2001, dismissing Dorsey's negligence and unseaworthiness claims, but ordering McDermott to pay Dorsey maintenance and cure until he reached maximum medical cure. On October 23, 2003, the trial court entered a judgment setting forth the amount of cure owed.
Dorsey and McDermott each appeal the trial court's judgments. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Kentrell Dorsey considered himself to be an experienced rigger. Prior to working for McDermott, Dorsey had over two years of rigging experience working for various employers. Dorsey was familiar with line handling and untying barges  something he did every day as a rigger. At the time of his injury, Dorsey had been working for McDermott as a rigger on Lay Barge 30 for approximately two months.
Lay Barge 30 was a pipe-laying barge. Material barges carrying pipe would be brought to and from Lay Barge 30 by means of a tugboat. It was the riggers' responsibility to moor the material barge to the lay barge using various lines or ropes. Generally, two nylon spring lines were placed at the bows and sterns of the barges to hold them together. The two barges were further secured by black and yellow, polypropylene breast lines, also known as mooring lines, that ran between the spring lines. The number of breast lines would vary, depending on such things as the size and make of the material barge and the weather. Once the pipe was offloaded, it was the riggers' responsibility to untie the lines so that the material barge could be released.
*486 The material barges were changed out approximately every twenty-four hours. The lead rigger, also referred to as the leaderman, and the barge foreman coordinated the process, directing the riggers' actions. At the time Dorsey was injured, Lynn Gautreaux was acting in the capacity of leaderman and Ray DeFelice held the position of barge foreman. Gautreaux and DeFelice had hand-held, two-way radios that they used to communicate with the crane operators on Lay Barge 30 and with the tugboat captains. The crane was available to lift heavy ropes and to transport riggers between the two barges in a personnel basket. The tugboat might be used to hold the material barge steady while the lines were being tied and untied.
When a material barge was being moored or released, the general practice was for two riggers to be carried in a personnel basket by crane to the material barge. The other riggers, generally four to six, would remain on the lay barge, along with the supervisors. A larger number of riggers remained on the lay barge because it was the living quarters and the site from which operations took place.
On August 25, 1997, Dorsey and another rigger, Randy West, were carried in the personnel basket to the material barge. The men began to individually untie the lines. During his testimony, Dorsey provided several different accounts of how his back injury occurred. First, Dorsey explained that one of the breast lines he was untying was mis-rigged; the eye of the rope was on the material barge, rather than the lay barge, and figure eights had been placed on top of the eye. Dorsey explained that this tying method made it difficult for him to get sufficient slack to untie the line. The rope with slack was hanging in the water. Dorsey stated he was directed by his supervisors to pull up the rope, which he did, injuring his back. Dorsey also claimed his injury was caused by the tugboat's failure to hold the barges together, tightening the line he was holding and preventing him from getting enough slack to remove the figure eights. Dorsey's final explanation of the cause of his injury was that an unidentified rigger on the lay barge let go of his end of the rope, causing the rope Dorsey was untying to wrap around his hand and jerk him. Dorsey testified that when this occurred, he cried out to Gautreaux that he was hurt.
The specifics of what happened may never be known, as no one was able to verify any of Dorsey's accounts of what occurred that day. West, the only other rigger on the material barge at that time, did not remember Dorsey, much less that an accident occurred. Neither Gautreaux nor DeFelice recalled witnessing an accident, although both were present on the lay barge and within shouting distance of Dorsey on the day in question. Similarly, Philip Cockerham, the barge crane operator, had no recollection of Dorsey or that an accident occurred.
When Dorsey returned to Lay Barge 30 via the personnel basket, he told Gautreaux he had hurt his back. Although Gautreaux instructed him to report to medic Bubba Essery, Dorsey continued to work, completing his shift. The next morning, after a fitful night, Dorsey reported to the barge medic; however, Dorsey did not tell Essery his back pain was the result of an accident. Essery instructed Dorsey to perform only light duty work, but Dorsey returned to his regular assignment. Shortly after resuming his regular duties, Dorsey returned to the medic in pain; again he did not report an accident. Dorsey was placed on bed rest. The next day, August 27, 1997, Dorsey returned to the medic, this time reporting that he was injured in an accident.
*487 Following his injury, numerous doctors treated Dorsey for back pain. Dorsey was first examined by Dr. Charles Parsiola at the Bourgeois Medical Clinic on August 27, 1997. Dorsey also sought the assistance of Dr. Coleridge Franklin, his family physician. Dorsey was then evaluated by four different orthopedic surgeons: Dr. Arthur Delmar Walker, Jr.; Dr. Neil Maki; Dr. Christopher Cenac; and Dr. Kenneth Adatto. With the exception of Dr. Adatto, the physicians found only an indication of a soft tissue injury with no disc involvement that would necessitate surgery. In contrast, Dr. Adatto recommended surgery, and in January 1999, Dorsey underwent a lumbar fusion at L4-5. Dr. Adatto last saw Dorsey in February 2000 and indicated Dorsey's back was at maximum medical improvement at that time. Dorsey indicated that he was pleased with the results of his back surgery.

ISSUES
On appeal, Dorsey raises four assignments of error:
1. The trial court erred in failing to find Lay Barge 30 and the material barge unseaworthy.
2. The trial court erred in failing to find McDermott negligent under the Jones Act.
3. The trial court erred in failing to award Dorsey damages for his injuries.
4. The trial court erred in failing to award attorney's fees because of McDermott's failure to pay maintenance and cure.
McDermott raises two assignments of error:
1. The trial court erred in finding Dorsey had not reached maximum medical cure at the time of trial.
2. The trial court erred in awarding Dorsey an amount of cure that included future treatment by psychiatrist David Mielke.

DISCUSSION

Standard of Review
In reviewing factual determinations made in Jones Act and general maritime cases, the manifest error standard of review is applied. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 96. The fact finder's factual determinations may not be disturbed on appeal unless they are clearly wrong. Stated another way, in order to reverse a factual determination, an appellate court must find: (1) a reasonable factual basis does not exist in the record for the finding; and (2) the record establishes that the finding is clearly wrong or manifestly erroneous. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of conflicting testimony and reasonable inferences of fact should not be disturbed upon review. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart, 617 So.2d at 883.

Jones Act Negligence and Unseaworthiness
The Jones Act, 46 U.S.C.A.App. § 688, provides a cause of action against a maritime employer based on negligence when a seaman is injured in the course and scope of his employment. The Jones Act contains a liberal causation requirement that entitles a seaman to recover if negligence chargeable to the employer played any part in producing the injury. See Jenkins v. Sonat Offshore U.S.A., Inc., *488 96-2504 (La.App. 1 Cir. 12/29/97), 705 So.2d 1184, 1187. An employer's negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards, and any other breach of the employer's duty of care. Foster v. Destin Trading Corporation, 96-0803 (La.5/30/97), 700 So.2d 199, 204-05. Under the Jones Act, both the employer and the seaman are obligated to act with ordinary prudence under the circumstances. Jenkins, 705 So.2d at 1187.
In contrast, liability under the doctrine of unseaworthiness does not rest upon fault or negligence. The owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. To be seaworthy, a vessel and its appurtenances must be reasonably suited for the use for which they were intended. A more stringent standard of causation is required to prevail on an unseaworthiness claim than on a Jones Act claim. Specifically, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about the injury and that the injury was either the direct result or a reasonably probable consequence of the unseaworthiness. Jenkins, 705 So.2d at 1187.
Although negligence and unseaworthiness are totally separate concepts, the same factual basis has been used to assert both theories of recovery. Cabahug v. Text Shipping Co., 98-0786 (La.App. 1 Cir. 5/12/00), 760 So.2d 1243, 1251, writ denied, 00-2366 (La.11/3/00), 773 So.2d 145. Herein, Dorsey asserted there was Jones Act negligence and/or unseaworthiness in the following: (1) improper rigging of the material barge to Lay Barge 30; (2) failure of a barge supervisor to properly direct the tugboat operator, to order the gantry crane operator to use a crane to pick up the polypropylene rope, to assign additional help to assist Dorsey in picking up the rope, and to order Dorsey to not pick up the rope; and (3) failing to establish a procedure for the rigging of lines and for the retrieval of wet lines.
Much of Dorsey's complaint is grounded in the allegation that the material barge was mis-rigged. Specifically, Dorsey challenges the placement of the eye of the rope, or line, on the material barge rather than on the lay barge. Gautreaux stated in his deposition that there is no rule regarding on which barge the eye of the line is to be placed. DeFelice also testified: "There's no certain set way how to tie up a material barge." Eldon Hutchinson, Lay Barge 30's superintendent with over twenty-eight years of offshore experience, confirmed that there is no set procedure for tying a material barge to a lay barge. Hutchinson had personally seen polypropylene breast lines tied with the eye on the material barge. Randy West's deposition testimony supported that of Gautreaux, DeFelice, and Hutchinson. "There is so many ways they can tie them up.... When you bring them in, you never tie the same barge  each barge the same way." West explained the barges are rigged "[a]ny way you can get over there and tie it off." In conclusion, despite Dorsey's protestations to the contrary, the overwhelming evidence supports the conclusion that having the eye of the line on the material barge is not indicative of the line being mis-rigged.
Moreover, the fact that the eye was under the figure eights, rather than on top of the figure eights, also is not indicative of an error. David Horman, McDermott's expert in vessel operations and marine safety, explained that one might place the figure eights on top of the eye in order to secure the eye when a single line is used. *489 When questioned about the difficulty of untying a line with the eye underneath figure eights, rigger West replied, "no biggy," explaining it is a lot quicker to tie a line that way.
Even if one were to assume it is more desirable for the eye of a line to be placed on the lay barge and for the eye to sit on top of the figure eights, the mere existence of a safer alternative does not by itself render an object unreasonably dangerous or present an unreasonable risk of harm. See Hebert v. Southwest Louisiana Electric Membership Corp., 95-405 (La.App. 3 Cir. 12/27/95), 667 So.2d 1148, 1160, writs denied, 96-0277 and 96-0798 (La.5/17/96), 673 So.2d 607 and 608. Moreover, we do not find an alternative method for tying and untying the lines would be any safer, since the rigger would still have to lift the rope. The testimony established that it is not unusual for a rigger to untie a breast line himself. As West succinctly stated, handling lines is "manual work." The fact that a rigger's duties require physical straining does not equate to a negligent or unseaworthy condition.
Dorsey also maintains that his injury was caused by there being insufficient personnel on board and because his supervisors failed to recognize his need for assistance in lifting the polypropylene line from the water. In evaluating this allegation, a distinction must be made between the nylon rope used for the spring lines and the polypropylene rope used for the breast lines. A dry nylon rope generally weighs four times more than a dry polypropylene rope. And, because the nylon rope absorbs water, the wet rope must be lifted with a crane. In contrast, the polypropylene line floats on water. DeFelice observed that generally one man can lift a polypropylene line that drops in the water. Hutchinson also stated that a polypropylene line is normally lifted from the water by hand, and one man should be able to do so. Horman also confirmed that the polypropylene lines are designed to be handled by personnel and not by a crane. Dorsey and Horman both testified that the usual custom is to have two riggers stationed on the material barge, each working independently to release the lines.
Gautreaux and DeFelice were on deck supervising the release of the material barge. Although Dorsey complains that neither Gautreaux nor DeFelice called the crane operator or another rigger to help him untie the breast line, he concedes he did not ask for help. Dorsey also did not request assistance from West. Dorsey acknowledged that he was familiar with offshore hand signals; however, he did not use them on the day he was injured to signal his supervisors, other riggers, or the crane operator that he needed assistance.
The record clearly supports the trial court's conclusion that McDermott was not negligent in causing Dorsey's injury. Similarly, the record supports the trial court's conclusion that the vessel was seaworthy. So concluding, Dorsey is not entitled to damages.

Maximum Medical Improvement
The maritime doctrine of maintenance and cure requires an employer to provide food, lodging, and necessary medical services to a seaman who becomes ill or injured while in service to the ship. Campbell v. Higman Barge Lines, Inc., 02-0937 (La.App. 3 Cir. 2/5/03), 838 So.2d 80, 87, writ denied, 03-0629 (La.5/2/03), 842 So.2d 1104. Entitlement to maintenance and cure is independent of the claims based on unseaworthiness or Jones Act negligence. To recover maintenance and cure, a seaman need only prove that the injury arose during his service of the vessel; the seaman does not have to prove a causal connection to his duties. Domonter v. C.F. Bean Corp., 99-1204 (La.App. 5 *490 Cir. 4/25/00), 761 So.2d 629, 640, writ denied, 00-1872 (La.9/29/00), 770 So.2d 354. Maintenance is compensation by way of a stipend to cover the costs associated with food and lodging, equivalent to that received on the vessel. Cure is payment of the seaman's medical, therapeutic, and hospital expenses until that point in time when the seaman reaches maximum medical cure. Campbell, 838 So.2d at 87. Maximum cure has been reached where it is probable that further treatment will result in no betterment in the claimant's condition. Boudreaux v. U.S., 280 F.3d 461, 468 (5th Cir.2002).
The trial court's judgment awarded Dorsey cure in the amount of $81,121.81, with interest. McDermott alleges the trial court's finding that Dorsey had not reached maximum medical cure is manifestly erroneous. In particular, McDermott challenges the award of $2,920.00 for Dorsey to receive psychiatric care from Dr. David Mielke.
In addition to receiving care for his physical injuries, Dorsey sought the medical assistance of a psychiatrist. David Mielke, a board certified professor of psychiatry at Tulane University Medical Center, examined Dorsey in June of 1998. Dorsey presented with complaints of decreased physical activity, depression, and decreased sexual drive. At the time of the appointment, Dorsey was abusing alcohol and illegal drugs. Dr. Mielke treated Dorsey for depression through September 20, 2000, and counseled him on his alcohol and drug abuse. Part of Dorsey's treatment included hospitalization at DePaul Hospital from July 27 through August 12, 1998.
In his deposition, Dr. Mielke stated that two years post-operative, Dorsey still suffered from anxiety and depression. Dr. Mielke explained that continued psychiatric care would assist Dorsey with coping with his continuing depression and with his lifestyle and occupational changes. Dr. Mielke also felt treatment would help Dorsey remain drug and alcohol free. Specifically, Dr. Mielke recommended Dorsey continue mental health visits four times a year for two years, and three times a year for the two years following. He also recommended that Dorsey continue on his psychiatric medication.
Maximum medical cure occurs when it is probable that further treatment will result in no betterment in the claimant's condition. Therefore, if a seaman requires therapy that will improve a mental condition brought on by his injury, he has not reached maximum medical cure. See Boudreaux, 280 F.3d at 469. The trial court's conclusion that Dorsey had not reached maximum medical cure and that Dorsey would benefit from further mental health treatment was not clearly erroneous.

Attorney's Fees
Dorsey submits the trial court erred in failing to award attorney's fees. Dorsey alleges McDermott was arbitrary and capricious in refusing to pay maintenance and cure. An award of attorney's fees is proper only if the employer has been found to act in a fashion that is callous and recalcitrant; arbitrary and capricious; or willful, callous, and persistent. Muhammad v. Diamond Offshore Co., 02-0172 (La.App. 3 Cir. 7/10/02), 822 So.2d 869, 877, writ denied, 02-2409 (La.11/27/02), 831 So.2d 279, cert. denied, 538 U.S. 1056, 123 S.Ct. 2215, 155 L.Ed.2d 1106 (2003).
McDermott was paying maintenance benefits to Dorsey at the time of trial. As to cure, medical opinions differed regarding the extent of Dorsey's physical and mental health. See Muhammad, 822 So.2d at 877. There is nothing in the *491 record to support a conclusion that McDermott acted in an arbitrary and capricious manner.

CONCLUSION
In resolving this legal dispute, it was necessary for the trial court to make numerous credibility determinations. The trial court's findings of fact are supported by the record and are not manifestly erroneous. The judgment of the trial court is affirmed in all respects and costs of this appeal are to be shared equally by the cross-appellants.
AFFIRMED.
PARRO, J., concurs.
GUIDRY, J., concurs in the result.