906 So.2d 431 (2005)
Joyce TERREBONNE
v.
B & J MARTIN INC. and XYZ Insurance Company.
No. 2003 CA 2658.
Court of Appeal of Louisiana, First Circuit.
October 29, 2004.
Rehearing Denied June 23, 2005.
*433 Joseph L. Waitz, Mary W. Riviere, Houma, for Plaintiff-Appellant Joyce Terrebonne.
Georges M. Legrand, Patrick E. Costello, New Orleans, for Defendants-Appellees B & J Martin Inc. and Underwriters Ins. Co.
*434 Before: CARTER, C.J., PETTIGREW, and McDONALD, JJ.
PETTIGREW, J.
In this case, plaintiff sought recovery under the Jones Act, based on the negligence of her employer, and under the general maritime law, based on the unseaworthiness of her employer's vessel. The trial court found in favor of plaintiff's employer. This appeal by plaintiff followed. For the reasons set forth below, we reverse in part, affirm in part, and remand.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Joyce Terrebonne, began working for defendant, B & J Martin, Inc. ("B & J"), in March 1998 as a cook aboard the M/V CAPTAIN JIMMIE, a trawler used for offshore site clearance. Mrs. Terrebonne's son, Orand Terrebonne, Jr. ("Orand, Jr."), was employed by B & J as a deckhand aboard the M/V CAPTAIN JIMMIE and her husband, Orand Terrebonne, Sr., was the captain of the vessel. Mrs. Terrebonne was injured on October 20, 1999, while attempting to board the M/V CAPTAIN JIMMIE. On the morning in question, Mrs. Terrebonne arrived for a crew change with Orand, Jr. and Chad Martin, another B & J employee. The vessel was moored to a dock in Freshwater City, Louisiana. Chad Martin and Orand, Jr. boarded the vessel immediately prior to Mrs. Terrebonne. As Mrs. Terrebonne stepped onto the cap railing of the vessel, she slipped and fell to the deck of the vessel on her hands and knees.
As a result of the injuries she sustained, Mrs. Terrebonne filed suit against B & J and its insurer, Underwriters Insurance Company, seeking the recovery of damages under the Jones Act for negligence and under general maritime law for unseaworthiness. The matter proceeded to a bench trial, at which time the trial court heard testimony and received documentary evidence into the record. Following trial, the parties submitted post-trial memoranda, and, on July 7, 2003, the trial court issued a judgment and reasons for judgment, finding in favor of B & J. The court concluded that the M/V CAPTAIN JIMMIE was seaworthy, that B & J was not negligent and did not breach its duty as a Jones Act employer of Mrs. Terrebonne, that Mrs. Terrebonne reached maximum medical improvement no later than April 16, 2001, and that any claims for medical expenses arising after April 16, 2001, were unreasonable and unnecessary. Thereafter, Mrs. Terrebonne filed a motion for new trial, which was denied by the trial court on September 15, 2003. This appeal by Mrs. Terrebonne followed,[1] wherein she assigned the following specifications of error:
1. The trial judge was manifestly erroneous in failing to find the M/V Captain [Jimmie] unseaworthy for failing to provide a safe means of ingress and egress.

*435 2. The trial judge was manifestly erroneous in failing to find the defendant negligent under the Jones Act.
3. The trial judge's decision was manifestly erroneous in failing to [find] that defendant's failure to provide a safe means of ingress/egress was in violation of 29 CFR 1926.1051; 29 CFR 1917.21; and 29 CFR 1915.74.
4. The trial judge committed error of law in denying plaintiff/appellant maintenance and cure beyond April 16, 2001.
5. The trial judge committed reversible legal error by striking plaintiff's expert witness, Robert Kubelka.

DISCUSSION

STANDARD OF REVIEW
A Louisiana appellate court applies the manifest error-clearly wrong standard of review of facts in general maritime and Jones Act cases. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96), 676 So.2d 89, 96. The two-part test for appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). This test dictates that a reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Stobart, 617 So.2d at 882.

JONES ACT NEGLIGENCE AND UNSEAWORTHINESS
The Jones Act, 46 U.S.C.A.App. § 688, provides a cause of action against a maritime employer based on negligence when a seaman is injured in the course and scope of his employment. The Jones Act contains a liberal causation requirement that entitles a seaman to recover if negligence chargeable to the employer played any part, even the slightest, in producing the injury. Jenkins v. Sonat Offshore U.S.A., Inc., 96-2504, p. 3 (La.App. 1 Cir. 12/29/97), 705 So.2d 1184, 1187. An employer's negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards, and any other breach of the employer's duty of care. Foster v. Destin Trading Corp., 96-0803, pp. 9-10 (La.5/30/97), 700 So.2d 199, 204-205. Under the Jones Act, both the employer and the seaman are obligated to act with ordinary prudence under the circumstances. Jenkins, 96-2504 at 3, 705 So.2d at 1187.
In contrast, liability under the doctrine of unseaworthiness does not rest upon fault or negligence. The owner's *436 duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. To be seaworthy, a vessel and its appurtenances must be reasonably suited for the use for which they were intended. A more stringent standard of causation is required to prevail on an unseaworthiness claim than on a Jones Act claim. Specifically, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about the injury and that the injury was either the direct result or a reasonably probable consequence of the unseaworthiness. Jenkins, 96-2504 at 3-4, 705 So.2d at 1187.
Although negligence and unseaworthiness are totally separate concepts, the same factual basis has been used to assert both theories of recovery. See Cabahug v. Text Shipping Co., Ltd., 98-0786, p. 10 (La.App. 1 Cir. 5/12/00), 760 So.2d 1243, 1251, writ denied, 2000-2366 (La.11/3/00), 773 So.2d 145. Herein, Mrs. Terrebonne asserted there was Jones Act negligence and/or unseaworthiness in the following: (1) B & J's breach of its legally imposed duty of care owed to Mrs. Terrebonne; (2) failure of B & J to provide Mrs. Terrebonne with a reasonably safe place to work; (3) failure of B & J to provide a proper and safe place to embark and disembark the M/V CAPTAIN JIMMIE; and (4) failure of B & J to maintain a reasonably safe vessel by, including but not limited to, failing to install hand railings.
Prior to the trial of this matter, the parties stipulated that at all pertinent times, Mrs. Terrebonne was employed by B & J as a Jones Act seaman aboard the M/V CAPTAIN JIMMIE. Moreover, B & J stipulated that an incident occurred on October 20, 1999, involving Mrs. Terrebonne and that as a result, she incurred certain medical treatment and expenses. Thus, the only issue for the trial court below was whether Mrs. Terrebonne's fall while boarding the M/V CAPTAIN JIMMIE was the result of an unseaworthy condition or Jones Act negligence.
In its reasons for judgment, the trial court makes a finding of fact that the distance from the cap railing to the deck of the vessel was approximately two and one-half feet or thirty inches. The court summarizes Mrs. Terrebonne's version of the accident as follows: "Ms. Terrebonne testified that she put her foot on the cap railing and as she stepped down onto the vessel her foot slipped and her other foot got caught in the trawl nets causing her to fall on her hands and knees." The court further finds that the cap railing was flush against the dock and that there was no handrail, ladder, or gangplank aboard the vessel. Based on our review of the record, and the usual deference that is accorded a fact finder at the trial level, we find there is a reasonable basis to support the court's findings in this regard and find no manifest error therein. Thus, we turn our focus to a determination of whether the trial court erred in finding that B & J was not liable for the injuries sustained by Mrs. Terrebonne on October 20, 1999.
The court found no liability under the Jones Act or under the doctrine of unseaworthiness, noting as follows:
The plaintiff worked on the M/V Captain [Jimmie] for approximately 18 months prior to the accident. She never had any concerns about safety or complaints about difficulty in getting on or off the vessel. Randy Terrebonne testified that on the date of the accident, he had crossed over the railing four to six times prior to the plaintiff's fall and did not have any problems in boarding the boat. Orand Terrebonne, Jr. testified that he did not have any difficulty crossing on to the boat and that sometimes the nets were used to step on as a step *437 down. He further testified that Joyce was falling when he turned around and he saw her foot get caught in the net. There was no evidence of a foreign substance on the cap rail on that morning other than the possible existence of dew accumulating over night.
. . . .
The mere presence of water on the cap rail does not render the vessel unseaworthy. Such conditions are reasonably expected and without a showing that the cap rail was unreasonably slippery, the ship owner is not liable for breach of warranty of seaworthiness. The vessel was flush against the dock, making a gang way or ladder useless. The M/V Captain [Jimmie] was reasonably fit for its intended use as a trawling vessel. The court notes that the plaintiff actually continued to work on [the] vessel following her accident for approximately six months without concern or difficulty in boarding or leaving the vessel. See Tate v. A/B Svenska Amerika Linein, 331 F.Supp. 854 (E.D.La.1970), affirmed 435 F.2d 172 (5th Cir.La.1970).
As to the issue of Jones Act negligence, B & J Martin owed a duty to Mrs. Terrebonne to provide a safe means of ingress and egress. The vessel was secured flush with the dock. The plaintiff chose her point of entry to the vessel and chose to board on a pile of nets. She could have boarded in an area that was clear of the nets. There was no need for a gangway or handrail. All of the witnesses testified that throughout their experiences with trawl boats, none were ever equipped with a gangway. The safety manual of B & J Martin refers to gangways and ladders and that they be kept clean and warns that ice, oil and slime [can] make them slippery. There is no evidence that the cap rail contained ice, oil or slime or any other foreign substance. The Court finds that B & J Martin, Inc. did not breach its duty to provide safe ingress and egress.
While we agree with the trial court that the mere presence of water on the cap rail did not render the M/V CAPTAIN JIMMIE unseaworthy, we find manifest error in the court's ultimate conclusion that B & J was not liable.
As noted by the trial court, the distance between the cap railing and the deck of the M/V CAPTAIN JIMMIE was approximately thirty inches. Mrs. Terrebonne testified that when she stood on the deck of the vessel, the cap railing was about mid-thigh high. Despite B & J's own safety manual, there was no handrail, ladder, steps, or gangplank for the crew members to use when boarding the vessel. With regard to "Ingress & Egress On Vessels," B & J's safety manual included the following instructions: "Use a gangway or ladder to board or exit the vessel. Gangways and ladders must be secured." When asked why the vessel did not have a gangway or ladder, Jimmie Martin, owner of B & J, stated that had the captain of the M/V CAPTAIN JIMMIE "deemed it necessary, there would have been one." However, Mr. Martin acknowledged that it would have been much easier to board the vessel had there been some type of handrail to hold onto or a ladder. Moreover, B & J did not designate a specific area to be used for boarding. Rather, as explained by Mrs. Terrebonne, she always boarded the vessel where she thought it would be easiest for her to board.
As previously outlined, Mrs. Terrebonne's burden of proof in establishing negligence under the Jones Act was simply whether B & J's negligence played even the slightest part in causing her accident. The more stringent causation requirement for Mrs. Terrebonne's claim of unseaworthiness *438 required her to show that the unseaworthy condition of the M/V CAPTAIN JIMMIE played a substantial part in bringing about or actually causing the injury. Following our thorough review of the record, we find Mrs. Terrebonne presented sufficient evidence to satisfy both of these burdens. The only way to board the M/V CAPTAIN JIMMIE was to step from the cap railing down to the deck of the vessel, a distance of approximately thirty inches. There was no ladder or gangway as was required by B & J's own safety manual. There were no established boarding procedures. Thus, we conclude that B & J breached its duty as a Jones Act employer and breached its duty to provide Mrs. Terrebonne with a seaworthy vessel.[2] Accordingly, we reverse the trial court's finding on liability and remand to the trial court for a consideration of comparative negligence, if any, and a determination of damages.

MAINTENANCE AND CURE
In assignment of error number four, Mrs. Terrebonne argues that the trial court erred in denying her maintenance and cure beyond April 16, 2001. Mrs. Terrebonne contends that any ambiguity with respect to the continuance of maintenance and cure must be resolved in her favor.
In Spencer v. State ex rel. Dept. of Transp. and Development, XXXX-XXXX, p. 5 (La.App. 1 Cir. 8/11/04), 887 So.2d 28, 32, this court recently outlined the concept of maintenance and cure as follows:
Maintenance and cure are centuries-old remedies under the general maritime law. A seaman's right to maintenance and cure is implicit in the contractual relationship between the seaman and his employer, and is designed to ensure the recovery of these individuals upon injury or sickness sustained in the service of the ship. Maintenance and cure are due without regard to the negligence of the employer or the unseaworthiness of the ship. Maintenance is a per diem living allowance, paid so long as the seaman is outside the hospital and has not reached the point of "maximum cure." Cure involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman, again, until the point of "maximum cure." Maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition. [Citation omitted.]
In the instant case, the parties stipulated at start of trial that maintenance and cure had been paid to Mrs. Terrebonne through April 25, 2001, and that there were outstanding medical bills in the amount of $20,675.20. The parties submitted most of the medical evidence by way of deposition testimony and medical records, outlining Mrs. Terrebonne's treatment following her accident on October 20, 1999. The trial court summarized the medical testimony in its reasons for judgment.
After the accident, Mrs. Terrebonne saw Dr. Marie Margiotti, an orthopaedic surgeon, reporting swelling and that her knee was popping. After examination, she was given strength exercises and allowed to return to light duty work. Mrs. Terrebonne continued to treat with Dr. Margiotti through March 9, 2000. Because of her continued improvement, Dr. Margiotti told her to return in three *439 to four months for a re-evaluation. On July 5, 2000, Dr. Margiotti recommended an MRI for Mrs. Terrebonne. The MRI revealed some degenerative changes.
Dr. Charles Johnson took over the orthopaedic treatment in August of 2000 and arthroscopic surgery was performed on September 27, 2000 with minimal findings. Her visits to Dr. Johnson continued and on December 6, 2000, she had no pain, swelling or crepitus and had a smooth gliding in her patella. He prescribed one more month of physical therapy. On January 17, 2001, Dr. Johnson examined her knee again and found full range of motion, clinically normal, and released her to full duty. His findings were confirmed on January 31, 2001, and again on March 14, 2001. His objective findings were that she should return to work and that there was no clinical basis for her not to. However, her subjective complaints continued and he suggested that she obtain a second opinion.
Also, in the year 2001, chiropractor, Dr. N.V. Tyree, treated her on five occasions between January 25, 2001 and April 26, 2001. On April 26, 2001, Dr. Tyree discharged Mrs. Terrebonne from his care. It was his belief that she would be able to function normally.
Mrs. Terrebonne went to see Dr. Gary Guidry on November 17, 2000, for a second opinion. At that point, Dr. Guidry referred her back to Dr. Johnson. After Dr. Johnson and Dr. Tyree released Mrs. Terrebonne, in April 2001, she went back to Dr. Guidry on May 16, 2001. His findings were that there was no effusion or swelling and that her knee was stable. But there was some crepitus. She also reported difficulty in climbing stairs. Dr. Guidry ordered [an] MRI which was performed on June 4, 2001. At that point Dr. Guidry did not feel any further surgery was necessary. He continued to treat her through January 3, 2002, and throughout this treatment his findings were essentially the same, that her knee was stable with good motion and no effusion although she had crepitus. He did not at any time recommend surgery. On October 18, 2001, Mrs. Terrebonne underwent a functional capacity evaluation by Dr. Richard Bunch. He concluded that there was no measurable impairment and that she was capable of light to medium work which would encompass work as a cook.
Plaintiff had been discharged by Dr. Johnson, Dr. Tyree and Dr. Guidry as having reached Maximum Medical Improvement at least by April 26, 2001. [Plaintiff's] outstanding medical expenses beyond that point were not reasonable or necessary and are not recoverable.
In December, 2001, plaintiff began treating with Dr. Logan, an orthopaedic surgeon in Covington. Logan prescribed a complete physical therapy regimen. Then without completing physical therapy, plaintiff's course of treatment was changed to arthroscopy. The minimal findings of the surgery performed in May, 2002, were essentially and virtually the same as the findings in the September, 2000, arthroscopy performed by Dr. Johnson.
After considering the medical evidence, the trial court found that Mrs. Terrebonne had reached maximum medical improvement no later than April 16, 2001, and that any and all claims for medical expenses arising after that date were unreasonable and unnecessary. The court offered the following in its reasons for judgment:

*440 Plaintiff's subjective complaints could not be corroborated medically. Her credibility was further undermined by her inaccurate testimony of her work history, her actions observed in the surveillance tape showing a normal gait and movements, as well as her ability to participate actively in a renovation project.
The defendants have shown that the medical treatment to plaintiff through January, 2001 and even April, 2001, met their obligation to provide medical care to plaintiff until maximum cure was reached. The remaining medical care was unnecessary and not reasonable. The plaintiff's stipulated claim for outstanding medical bills is denied.
Based on our thorough review of the medical evidence, we conclude there is a reasonable basis to support the court's findings in this regard. The trial court's conclusion that Mrs. Terrebonne reached maximum medical improvement no later than April 16, 2001, was not manifestly erroneous. Thus, we affirm that portion of the court's July 7, 2003 judgment.

EXPERT TESTIMONY OF ROBERT KUBELKA
In her final assignment of error, Mrs. Terrebonne asserts the trial court committed reversible error by striking her expert witness, Robert Kubelka. Citing La.Code Evid. art. 702, Mrs. Terrebonne argues, "[b]ecause Mr. Kubelka's testimony would have assisted the trier of fact in deciding the issues of liability, the Trial Judge's ruling to strike the plaintiff's expert was prejudicial legal error." We agree.
The requirements of expert testimony are set forth in La.Code Evid. art. 702. It states, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The Daubert standard, which was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116, 1123 (La.1993), requires that "expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702."
In the instant case, B & J filed a motion in limine to strike the testimony of Mr. Kubelka, arguing (1) that his report was untimely; (2) that neither scientific nor technical knowledge were necessary in this case; and (3) that Mr. Kubelka was not qualified to render an opinion on the issues addressed in his report. The motion was argued by the parties on November 8, 2002. Counsel for Mrs. Terrebonne indicated that Mr. Kubelka, a safety expert, would testify as to the proper and reasonable means of safe ingress and egress on a vessel. Counsel for B & J submitted that based on the nature of the case, Mr. Kubelka could not add anything from a scientific or technical standpoint. After hearing from both sides, and without applying the gate keeping standard articulated by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the trial court decided to strike Mr. Kubelka's testimony, concluding as follows:
I think that rather than ruling on whether or not Mr. Kubelka is qualified to give that type of testimony, I just don't think it's going to add anything to the trial, and I will strike him for that reason. Because I think that those are facts upon which I can apply the law to.
*441 We conclude it was legal error for the trial court to strike Mr. Kubelka's testimony without first conducting a hearing to determine if Mr. Kubelka's testimony constituted reliable expert testimony as contemplated in Daubert.[3]

CONCLUSION
For the above and foregoing reasons, we reverse the trial court's finding on liability and render a judgment in favor of Mrs. Terrebonne, finding that B & J breached its duty as a Jones Act employer and breached its duty to provide Mrs. Terrebonne with a seaworthy vessel. We remand the case to the trial court for a consideration of comparative negligence, if any, and a determination of damages. Moreover, we affirm the trial court's finding that Mrs. Terrebonne reached maximum medical improvement no later than April 16, 2001, and that any and all claims for medical expenses arising after that date were unreasonable and unnecessary. All costs associated with this appeal are assessed against defendants/appellees, B & J Martin, Inc. and Underwriters Insurance Company.
REVERSED IN PART AND RENDERED; AFFIRMED IN PART; REMANDED.
NOTES
[1] According to the record, Mrs. Terrebonne actually appealed from the September 15, 2003 judgment denying the motion for a new trial. The denial of a motion for a new trial is not an appealable judgment absent a showing of irreparable harm. Morrison v. Dillard Dept. Stores, Inc., 99-2060, p. 2 (La.App. 1 Cir. 9/22/00), 769 So.2d 742, 744, writ denied, XXXX-XXXX (La.2/2/01), 784 So.2d 646. However, we note that the Louisiana Supreme Court has directed us to consider an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits as well, when it is clear from the appellant's brief that it was intended to appeal the merits of the case. Carpenter v. Hannan, XXXX-XXXX, p. 4 (La.App. 1 Cir. 3/28/02), 818 So.2d 226, 228-229, writ denied, XXXX-XXXX (La.10/25/02), 827 So.2d 1153. It is obvious from Mrs. Terrebonne's brief that she intended to appeal the judgment on the merits. Thus, we will treat the appeal accordingly.
[2] Because of our finding of liability based on Jones Act negligence and unseaworthiness, we pretermit consideration of whether B & J's failure to provide a safe means of ingress and egress was in violation of 29 C.F.R. § 1926.1051, 29 C.F.R. § 1917.21, and 29 C.F.R. § 1915.74.
[3] We note that the trial court's action in this regard constitutes prejudicial legal error that would warrant reversal on the liability issue had this court not already concluded that B & J breached its duty as a Jones Act employer and breached its duty to provide Mrs. Terrebonne with a seaworthy vessel.